UNITED STATES of America, Plaintiff,

v.

CITY OF TAYLOR, MICHIGAN,
Defendant.

SMITH & LEE, ASSOCIATES,
INC., Plaintiff,

v.

CITY OF TAYLOR, MICHIGAN,
Defendant.

Nos. 91–CV–73218–DT, 91–CV–72280–DT.

United States District Court,
E.D. Michigan, S.D.

July 14, 1992.

Gregory J. Bator, Birmingham, Mich., for plaintiff Smith & Lee Associates, Inc.

Stephen J. Markman, L. Michael Wicks, U.S. Atty., Detroit, Mich., John R. Dunne, Paul F. Hancock, Barbara A. Burr, Sharon Bradford Franklin, U.S. Dept. of Justice, Civil Rights Div., Housing & Civil Enforcement Section, Washington, D.C., for plaintiff U.S.

Patrick B. McCauley, Alan B. Koenig, Southfield, Mich., for defendant.

## OPINION

GILMORE, District Judge.

In these consolidated cases, the Plaintiffs have alleged that Defendant in each case violated the handicap provisions of the Fair Housing Act by refusing to give zoning approval to Smith and Lee to operate an adult foster care home for twelve elderly disabled persons in a house located in a single-family residential area of Taylor.

Basically, Plaintiffs claim that Taylor's actions have violated the Fair Housing Act in two ways: First, by refusing to allow Smith and Lee to operate their group home in the Mortenview neighborhood, Taylor violated the reasonable accommodations provision of the Act, 42 U.S.C. § 3604(f)(3)(B). Secondly, Plaintiffs claim that Taylor's actions also violate the Fair Housing Act by making housing unavailable on the basis of handicap of the intended residents, thus violating 42 U.S.C. § 3604(f)(1).[1]

After a full trial on the matter, the Court concludes that Defendants have violated the statute in question, and will issue an injunction, and award $50,000.00 in civil penalties against Taylor; and will award damages to Smith and Lee.

I

Smith & Lee Associates, Inc. (Smith & Lee) is a private, for-profit Michigan corporation that was organized to purchase and use a residential home as an adult foster care (AFC) home for twelve elderly, disabled persons. Smith & Lee's officers, who are each 25% shareholders, are Marlene Smith, President; Paul Lee, Vice President; Cullin Smith, Treasurer; and Linda Lee, Secretary. An AFC home provides twenty-four hour supervised care to dependent adults who require ongoing supervision, but not continuous nursing care.

Smith & Lee purchased a home for such use at 8734 Mortenview Drive in Taylor, Michigan. The home, known as Mortenview Manor, is a one-story dwelling, and includes a kitchen, living room, dining room, and, after remodeling, six bedrooms, two full baths, and a small office.

The City of Taylor is a Michigan municipality that has adopted a comprehensive zoning ordinance. The Court finds that Mortenview Manor is not a building of efficiencies or apartments. The home is located in a large, single-family neighborhood zoned "R–1A." Both Plaintiffs allege that the City of Taylor failed to reasonably accommodate, and discriminated against, the disabled elderly by not permitting Mortenview Manor to expand from six to twelve residents.

Smith & Lee's proposed AFC facility would provide a home in the Mortenview residential neighborhood for twelve elderly persons who suffer from disabilities such as Alzheimer's disease, senile dementia,

---

1. On May 10, 1991, Smith & Lee initiated its suit alleging violations of the Fair Housing Act pursuant to 42 U.S.C. §§ 3604(f)(1)(B), 3604(f)(3)(B), & 3617. The United States of America initiated its suit on June 28, 1991, alleging violations of the Fair Housing Act pursuant to 42 U.S.C. §§ 3604(f)(1) and 3604(f)(3)(B). This Court consolidated the cases on January 29, 1992.

and *organic brain syndrome,* and physical problems associated with growing old. At the current time, Smith & Lee operates the home for six elderly disabled residents. Mortenview Manor opened on December 1, 1989 and attained its sixth resident on March 1, 1990.

Michigan state law requires that municipalities such as Taylor permit AFC homes for six or fewer residents to locate in single-family residential neighborhoods. M.C.L. § 125.583b.[2] To operate an AFC home for twelve residents, Smith & Lee must obtain local zoning approval to qualify for a state license. M.C.L. § 400.716.

Smith & Lee seeks to expand its capacity to twelve residents because operating the home with only six residents is not financially feasible. With the extra income from twelve residents, Smith & Lee can continue its high level of care and reasonably compensate its employees. Thus far, Smith & Lee has been unable to secure zoning approval from Taylor.

Taylor's Zoning Ordinance does not address AFC homes. The R–1A zone, where Mortenview Manor is located, is the most exclusive type of single-family zone. The ordinance includes in the definition of "family" the following:

a. ...

b. A collective number of individuals domiciled together in one (1) dwelling unit whose relationship is of a continuing nontransient domestic character and who are cooking and living as a single nonprofit housekeeping unit....

[Zon.Ord. § 2.02(36)].

For the sake of its R–1A zone, Taylor contends that the residents of Mortenview Manor do not constitute a family under that definition because the home is operated for a profit.

**II**

Starting in September, 1989, Smith & Lee first encountered Taylor's opposition to its proposed AFC home for twelve residents. On September 13, 1989, Smith & Lee's building contractor, Al Darin, applied to Taylor for a building permit to remodel the home. The City refused to issue the permit, claiming that the property was improperly zoned. The next day, Linda Lee and Marlene Smith met with Michael Manore, Director of the Office of Development Services, who informed them that the City required RM–1 multiple-family zoning if they wanted a home for twelve. He also needed plans of the project before issuing a permit.

Later, on September 21, 1989, Mrs. Lee and Mrs. Smith returned to City Hall to file an application for a building permit with a building plan. Building Director Gerald Couch refused to issue a permit. Mrs. Lee and Mrs. Smith expressed concern about the Fair Housing Act, and later asked Marjorie Murrell, an AFC Licensing Consultant with the Department of Social Services (DDS) in Detroit, to educate the City about its obligations under state and federal law. Murrell talked with Mr. Couch and Mr. Manore about the Fair Housing Act's new coverage for the disabled and noted that Smith & Lee were able to open for six residents automatically under Michigan law. M.C.L. § 125.583b. Finally on September 25, 1989, Taylor issued Smith & Lee's building permit with the express limitation "SINGLE FAMILY RESIDENTIAL USE ONLY."

After this remodeling, Ms. Murrell inspected the home and property in November 1989. She found that the home exceeded all DSS licensing requirements for homes for up to six residents. The DSS then issued a license to Smith and Lee to

---

**2.** The statute provides, in pertinent part:
In order to implement the policy of this State that persons in need of community residential care shall not be excluded by zoning from the benefits of normal residential surroundings, a State licensed residential facility providing supervision or care, or both, to six or less persons, shall be considered a residential use of property for the use of zoning, and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone.

operate an AFC home for up to six residents.

Mortenview Manor opened on December 1, 1989 with three residents. On January 26, 1990, Smith & Lee held an open house to advertise the home and establish goodwill with the community. Linda Lee invited Taylor's Mayor, all members of the Planning Commission and City Council, representatives of the Fire and Police Departments, and other city officials. None attended. As of March 1, 1990, Smith & Lee operated with six residents. And since this time, Smith & Lee has turned away a number of potential residents because the home was filled to its licensed capacity.

In order to operate with twelve residents, Smith & Lee sought to rezone its property. On January 8, 1990, Cullin Smith went to Taylor's City Hall to investigate how to rezone. He submitted a petition to rezone Mortenview Manor from R–1A single-family to RM–1 multiple family. He stated on the petition that proposed use was for the adult foster care of seven to twelve aged, disabled adults.

Taylor officials referred Smith & Lee's proposal to its planning consultant, Wade/Trim Impact. A public hearing before the Taylor Planning Commission was scheduled for February 21, 1990. By a letter report dated February 15, 1990, Wade–Trim advised Taylor to deny Smith & Lee's request. The letter gave three reasons for denial of Smith & Lee's petition: (1) RM–1 zoning would be inconsistent with the established zoning pattern of the neighborhood; (2) RM–1 zoning would allow for land uses that are incompatible with the established single-family residential character of the neighborhood; and (3) the request was inconsistent with the recommendation of the City's Master Land Use Plan 2000.

On February 19, 1990, Mr. Smith delivered portfolios of information explaining Smith & Lee's proposed use to various city offices, including the Planning Commission and the City Council. At the meeting before the Planning Commission on February 21, 1990, the Smiths represented Smith & Lee and presented their proposal. Both

mentioned that Taylor may be in violation of the Fair Housing Act but the Commission failed to consider its ramifications. The Commission voted to recommend to the City Council that the rezoning petition be denied. Only member James Boardman voted for approval of the petition.

At a March 5, 1990 Study Session, the Taylor City Council discussed Smith & Lee's request for rezoning and the Planning Commission's recommendation. The Smiths and the Lees attended. Linda Lee answered questions and informed the Council that the home could accommodate twelve residents under the State's regulations. In addition, Mark Fosdick, attorney and vice president of Michigan Residential Care Association, made a presentation on behalf of Smith & Lee. He explained that the Fair Housing Act has an impact on this action and that Smith & Lee's request to expand its capacity to twelve people was reasonable.

After the session, Linda Lee invited Council Member Raymond Basham to visit Mortenview Manor the next day before the City Council meeting. During the day on March 6, 1990, Mr. Basham visited the home, and was impressed and found it to be clean and well-maintained. After his visit, Mr. Basham called Ms. Murrell, at Ms. Lee's request. Ms. Murrell told him that Smith & Lee can expand its capacity if the City Council approved rezoning or issued a letter of permission approving the expansion. Mr. Basham then told Ms. Lee that the Council would only vote on the issue of spot zoning that night. Later at the City Council Meeting, the Council voted unanimously to deny Smith & Lee's request for rezoning. The primary reasons cited by council members were concerns over spot zoning and that the request was inconsistent with the Master Use Plan.

On March 16, 1990, Linda Lee and Marlene Smith visited Council Chairman John Delo and delivered to him a letter requesting that Smith & Lee be placed on the agendas for the March 19, 1990 Study Session and the March 20, 1990 Council meeting in order to discuss the letter proposal.

Smith & Lee could present its request at the March 19, 1990 Study Session.

At the March 19, 1990 Study Session, Linda Lee presented a proposal for a letter of no-opposition from Taylor to DSS, as suggested by Ms. Murrell. However, the proposal never came to a vote, and Chairman Delo did not place Smith & Lee on the agenda for the March 20, 1990 City Council meeting.

On April 18, 1990, Ms. Murrell inspected Mortenview Manor. In a letter dated June 5, 1990 to Mrs. Lee and Mrs. Smith, Ms. Murrell confirmed the Mortenview Manor's license renewal for approve for six residents and determined that the home could be approved for twelve residents once they obtained a letter of permission from Taylor indicating no opposition.

### III

It is clear that the Mortenview Manor is a dwelling for the purposes of the Fair Housing Act because it is structure "occupied as ... a residence by one or more families." 42 U.S.C. § 3602(b). Furthermore, the Court concludes that the present and proposed residents of Mortenview Manor are handicapped under the Act. The residents suffer from Alzheimer's Syndrome, senile dementia, and organic brain syndrome, along with physical problems associated with the elderly, such as hypertension and hip replacements. Because these mental and physical impairments "substantially limit one or more of [these residents'] major life activities," they are therefore handicapped under the Act. 42 U.S.C. § 3602(h)(1).

It is also evident that Plaintiffs must prevail on the issues of exemption and exhaustion of remedies.[3] The United States is not required to exhaust administrative remedies pursuant to 42 U.S.C. §§ 3610(f)(1) and 3610(f)(3), which require the Department of Housing and Urban Development to refer complaints to state agencies certified by the Secretary.[4]

### IV

It is clear to the Court that the City of Taylor has violated the Act, both in refusing to make reasonable accommodations, in violation of Section 804(f)(3)(B) of the Act, 42 U.S.C. § 3604(f)(3)(B), and in discriminating against present and proposed members of Mortenview Manor based on handicap, in violation of Sections 804(f)(1), 42 U.S.C. § 3604(f)(1). In a parade of witnesses from the Defendant, the Court heard from five members of the City Council. With the exception of Raymond Basham, who took the time to go to the facility and appeared to have put considerable thought into the matter, all members of the Council said substantially the same thing.[5] Every other council member testified that he or she would not, under any circumstances, approve spot zoning, that the impact of seven to twelve people in the home located in a R–1A district would be bad, and that none saw why any civil rights act was applicable here. To them, it was clearly a matter of zoning and land use.

Chairman Delo voted against the rezoning because he did not want spot zoning. He said his basic reasons were because parking, fire and police problems were con-

---

3. Taylor is not exempt from the Fair Housing Act under 42 U.S.C. § 3603(b)(1) because this provision is applicable only to the sale and rental transactions of single family homeowners and not of municipal actions affecting single family homes. Additionally, Taylor is not exempt under 42 U.S.C. § 3607(b)(1), which permits reasonable restrictions regarding the maximum number of occupants permitted to occupy a dwelling. Nothing in Taylor's zoning ordinance, including its definition of family, places restrictions on the maximum number of occupants.

4. Here, the Secretary has not certified the Michigan Civil Rights Commission to process com-

plaints because the remedies provided under the Michigan Handicappers' Civil Right Act, M.C.L. § 37.1101 *et seq.*, are not "substantially equivalent" to those under the amended Fair Housing Act. Therefore, these provisions are not applicable.

5. Even Councilman Basham, who voted against the spot zoning and does not know why the letter proposal to the Council was never placed on the agenda, says he personally saw no harm in a seven to twelve person home, and saw no parking problem with a home of twelve persons. (For a discussion of the parking problem, *see* text.)

siderable. He gave no consideration to the letter proposal, suggested by Ms. Murrell, nor did many of the council members who testified after him. He feared the potential loss of property values. He agreed that twelve unrelated adults could live together, share expenses, and rent a home in a single-family district, but could not explain how this would be any different from having AFC home with twelve people. Delo suggested that the difference lies in the fact that the AFC residents are not capable of caring for themselves, thereby requiring for-profit care services in violation of Taylor's definition of "family." He stated, however, that, if the project were nonprofit, he would have fewer objections to it, and said that all R–1A districts should be nonprofit.[6]

Councilman Frank Bacha, Jr. also testified. He again brought up the parking problem, and says this was one of the main reasons he was against the facility. He admits, however, that there have been no studies of the effect of twelve residents on the parking in this area. Bacha also testified that permitting Mortenview Manor to house twelve residents would not be fair to the taxpayers who chose this specific neighborhood based on reasons such as character. Pauline Ettore, a member of the Council since 1989, could not say why there was any difference between twelve unrelated adults living together in rented property and twelve handicapped in an adult foster home. She gave the usual argument about parking and its problem.

It seems clear to the Court that all council members agreed in advance as to their testimony, and they all testified as to the same things: that parking was a problem,

that the police and fire were problems, that the whole issue is zoning, and that they certainly do not want to discriminate against the handicapped. This constant repetition of the parking, police, fire, and zoning matters seriously destroyed the credibility of all members of the City Council who testified.[7]

## V

There is no question in the Court's mind that Taylor could have reasonably accommodated Smith and Lee's proposal to house twelve disabled, elderly residents in light of its zoning requirements. The Act requires the Defendant make "reasonable accommodations in [its] rules, policies, practices, or services ... necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). This requirement of reasonable accommodation imposes affirmative duties on the City to accommodate the needs of persons with disabilities. *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1384–85 (3d Cir.1991). The Act, applicable to state and local land use laws and ordinances, demands that municipalities such as Taylor change their rules to afford the elderly handicapped the same opportunity to housing as those who are not handicapped. *U.S. v. Village of Marshall, Wis.,* 787 F.Supp. 872, 867–78 (W.D.Wis.1992). *See, also, U.S. v. Puerto Rico,* 764 F.Supp. 220, 224 (D.P.R.1991); *Oxfordhouse–Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1344–45 (D.N.J.1991); *U.S. v. City of Parma, Ohio,* 661 F.2d 562, 572 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982).[8]

---

**6.** It should be noted that there was testimony establishing that neighbors run a for-profit construction, MTM Installations, next door to Mortenview Manor, and a welding company, Cargill's Portable Welding, operates out of a home down the street. Nothing was done by the City Council or the City's Corporation Counsel to stop these uses of R–1A property for business purposes.

**7.** It should be noted that Councilwoman Pauline Ettore admitted that she did run a for-profit business from her house in an R1–A district, and still does.

**8.** The holding of *Elliott v. City of Athens, Ga,* 960 F.2d 975 (11th Cir.1992), cited dramatically by the Defendant in the middle of trial, does not call for a different conclusion. The zoning ordinance there was totally factually distinguishable from that of Taylor, and, thus, the affirmance of a judgment for the City of Athens has no bearing here. The *Athens* zoning ordinance's definition of family included an explicit numerical cutoff of four unrelated persons, and applied equally to all residents, whether disabled or nondisabled. By contrast, Taylor's zoning ordinance has no numerical cutoff for the number

■ The Court holds that the accommodation requested by Smith & Lee was reasonable because Taylor did not have to alter its zoning scheme or incur any undue administrative or financial burdens. *Village of Marshall, supra,* at 878–79; *Southeastern Community College v. Davis,* 442 U.S. 397, 410–12, 99 S.Ct. 2361, 2369–70, 60 L.Ed.2d 980 (1979).

Taylor's claim that the AFC home would cause traffic and parking problems has no basis in fact. There has never been any studies of potential traffic or parking problems at the Mortonview location. It was clearly established in the trial that, except for trash pickup day, parking is permitted on all parts of Mortenview Drive. Further, none of the residents drives or has a vehicle, and a circular drive was installed by Smith and Lee to accommodate any increased need for parking.

In addition, it is clear that the proposal here is necessary to insure equal housing opportunity for persons with disabilities, especially for those who are elderly. In enacting the 1988 Amendment, Congress was cognizant of the restrictions placed by state and local governments upon the ability of individuals with disabilities to live in their communities. It found that, because these demands "... are not imposed on families or groups of similar size or other unrelated people, these requirements have the effect of discriminating against persons with disabilities." H.R.Rep. No. 100–711, 100th Cong., 2d Sess. 24 (1988), *reprinted* in 1988 U.S.C.C.A.N 2173, 2185.

There is no indication on the record that a reasonable accommodation would cause the City or the Mortonview neighborhood any burden. Taylor could have easily issued a letter of permission as suggested by Ms. Murrell of DSS and as presented by Linda Lee to the City Council at its Study Session of March 19, 1990. The Court therefore finds Taylor in violation of 42 U.S.C. § 3604(f)(3)(B) because it could have reasonably accommodated Mortenview

Manor housing twelve residents. *See also Parish of Jefferson v. Allied Health Care,* Civ. Nos. 91–1199, 91–1200, 91–3959, slip op., 1992 WL 142574 (E.D.La. June 10, 1992).

## VI

■ It is obvious to the Court that Taylor officials intentionally discriminated against the proposed residents by making unavailable and denying housing based upon their handicaps. To show Taylor's intentional discrimination, the Court need not find that a discriminatory animus was the sole basis of the City's actions. *U.S. v. City of Birmingham, Mich.,* 727 F.2d 560, 565 (6th Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *City of Parma, supra,* at 575. Rather, the Court must inquire into the available direct and circumstantial evidence to find that such an intent was a factor, because " '[m]unicipal officials in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against [a protected class].' " *City of Birmingham, supra,* at 564, quoting *Smith v. Town of Clarkton,* 682 F.2d 1055, 1064–65 (4th Cir.1982).

■ First, the Court finds that Taylor's past discrimination against the disabled seeking AFC shelter is probative of its discriminatory intent in this case. *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 266–68, 97 S.Ct. 555, 564–65, 50 L.Ed.2d 450 (1977); *United States v. West Peachtree Tenth Corp.,* 437 F.2d 221, 227 (5th Cir.1971). In 1980, Taylor used its zoning power to prevent the Southgate Regional Center for Developmental Disabilities from opening an AFC home for six developmentally disabled adults on Leader Street in Taylor. The City then challenged the Michigan Adult Foster Care Licensing Act by suing DSS and several other defendants in a 1981 suit in Wayne County Circuit Court, and ac-

---

of unrelated nondisabled people who may live together as a family, but operates to discriminate against disabled people by limiting the number of unrelated disabled people who may

live together for the sole reason that the disabled people are handicapped and have to pay for care.

knowledged in one count of its complaint that Taylor residents are "concerned with the city being a 'dumping ground' for mentally retarded." Summary judgment was granted to the defendants on July 9, 1982, and by 1982 a court order instructed Taylor that under the AFC Licensing Act, the City must allow AFC homes for up to six residents in a single-family neighborhood. The Court finds that this historical discrimination demonstrates Taylor's intent to segregate persons with disabilities outside of residential neighborhoods.

Furthermore, the direct evidence presented at trial reveals the officials' discriminatory animus towards the elderly handicapped. In addition to the testimonies of the council members noted above, Planning Commissioner Ronald Moran testified that visits by doctors and other medical personnel caused his concern over traffic and parking. Council member Jack Hayden also thought that an AFC home of twelve, which he characterized as not normal like a family, would have a greater impact than a regular family of twelve. He gave no support for this conclusion. Likewise, Hayden, Moran and Council member Riddle also stated that Taylor never commissioned any studies to inquire about the impact of parking, traffic, police or fire if Mortenview Manor had twelve residents. No official ever received a complaint from the citizens of the Mortenview neighborhood about the home.

Moreover, Taylor's series of demands upon Smith & Lee, in attempting to gain approval for its proposal, is circumstantial evidence highlighting the City's pretextual rationales and thus its discriminatory intent. *Arlington Heights, supra; Stewart B. McKinney Foundation v. Town & Zon. Comm. of the Town of Fairfield,* 790 F.Supp. 1197, 1211–16 (D.Conn.1992). The City's instruction that Smith & Lee must request a rezoning from R–1A single-family to RM–1 multiple-family doomed the proposal from the start. The Court finds that Mortenview Manor is not a building of efficiencies or apartments. Yet, no official has proffered a clear reason why rezoning it to a multiple-family use was appropriate, especially since the Zoning Ordinance does not address AFC homes and that Mortenview Manor fits the R1–A zone's family definition but for its profit status. This requirement was not rational given that the AFC home for twelve does not fit any of the Zoning Ordinance's definitions of permitted uses in a RM–1 district. *See* Zon. Ord., § 7.01 *et seq.* Even if the property could be rezoned as a RM–1 district, the Zoning Ordinance prevents any owner from making substantial changes to the structure of the building without the City's permission. The Court holds all of these reasons to be illusory. *See Casa Marie, Inc. v. Superior Court of Puerto Rico for Dist. of Anecibo,* 752 F.Supp. 1152, 1167–68 (D.P.R.1990); *A.F.A.P.S. v. Regulations & Permits Admin.,* 740 F.Supp. 95, 104–06 (D.P.R.1990).

Finally, Taylor fails to show how an AFC home's for-profit status, or lack thereof, negatively impacts upon the community, thereby not meeting the R–1A zone's definition of the family. First of all, the residents themselves do not engage in profit-making activity and thus the Court questions the City's interpretation that Mortenview Manor is a for-profit venture. This conflicts with Defendant's concession that twelve unrelated adults can rent a home in a single-family neighborhood without running afoul of its family definition. Not one official has articulated a legitimate reason why the Mortenview home, even if considered for-profit, cannot operate, but other for-profit endeavors can. For example, Taylor permits for-profit home occupations in single-family residential neighborhoods, including welding and construction businesses in the Mortenview neighborhood. Taylor therefore allows these profit-making ventures but, for no apparent reason other than the residents' handicaps and the services they require, it denies twelve elderly, disabled people from paying room and board to live together as a family. Such a denial is impermissible under the Fair Housing Act because Taylor's actions violate the residents' "right to be free from housing discrimination [which] is essential to the goal of independent living."

H.R.Rep. No. 711, *supra,* at 18, 1988 U.S.C.C.A.N. at 2179.

## VII

■ The Court, however, does not find for Plaintiff Smith & Lee on its Section 817 claim because the City's officials neither interfered, nor coerced, intimidated, or threatened any of the members of Smith & Lee in their efforts to aid the disabled in the rights to housing. 42 U.S.C. § 3617. This provision prohibits unrelated third parties from interfering with anyone attempting to aid others protected under the Act. *People Helpers Foundation, Inc. v. City of Richmond,* 781 F.Supp. 1132, 1134 (E.D.Va.1992). Although the Court finds the requirements placed upon Smith & Lee to be violative of the Act, the Defendant nevertheless allowed Smith & Lee to follow their procedures to apply for permits, file petitions, present their proposals at public meetings, and, if they wished, appeal any decisions. Furthermore, the dogged efforts by the members of Smith & Lee evinces no indication that they ever felt coerced, intimidated, or threatened. The Court holds there to be no illegal interference under Section 817.

## VIII

The Court must now turn to the question of what relief should be afforded the parties. Clearly, the request of the United States' for injunctive relief must be granted, and an injunction may be presented directing Defendant City of Taylor, it employees, agents and successors, and all those acting in contract of participation with them from: a) refusing to permit Smith & Lee Associates to operate an AFC home for up to twelve disabled residents in the house located at 8734 Mortenview Drive, Taylor; b) interfering in any discriminatory way in the operation of the group home; and c) refusing to make reasonable accommodations in its rules, policies, practices, and services for adult foster care homes or other facilities, or homes for handicapped persons when such accommodations may be necessary to afford disabled persons an equal opportunity to use and enjoy a dwelling.

The injunction will further provide that the Defendant shall, within ten days of the entry of the final judgment in this case, send a letter, on City of Taylor letterhead, to the Michigan Department of Social Services Adult Foster Care Licensing Division stating that the City has no objection to the operation of an adult foster care home for twelve disabled residents at 8734 Mortenview Drive, Taylor, and that Smith and Lee has Taylor's permission to operate such adult foster care home at that address.

Taylor shall also pay a civil penalty to the United States in the amount of $50,000.00 pursuant to 42 U.S.C. § 3614(d)(1)(C)(i).

The Court finds that the members of Smith & Lee Associates are aggrieved persons under the Act because they have been injured by the discriminatory practices of the City of Taylor. 42 U.S.C. § 3602(i). Therefore, the Court awards them their actual damages of $152,000, which represents the revenue through May 31, 1992 if Smith & Lee had been able to open and fill Mortenview Manor with twelve residents on April 1, 1990. The Court adopts the Plaintiffs' calculations as to damages. *See* Chart, Appendix A.

No escrow account, as requested by the Plaintiff, to be distributed in equal amounts to six disabled people who would have resided in Smith and Lee's Mortenview home but for Taylor's conduct, will be ordered. Such a claim is highly speculative, and this Court cannot find any basis in the record for these presumed damages to exclude potential residents. The record just does not support such a claim.

The Court finds there is no basis for awarding damages for emotional distress to any one of the four owners of Smith and Lee, nor does it find any basis for the award of punitive damages. Therefore, the damage award to Smith and Lee Associates will be the amount of $152,000.00, plus costs to be taxed.

Finally, within 30 days of the entry of final judgment Counsel for Smith & Lee may file a petition for fees pursuant to 42 U.S.C. § 3613(c)(2). *See* Local Rule 54.2.

APPENDIX A

### 1. Anticipated Gross Revenue if Smith and Lee had 12 Residents

$18,200.00 [ (10 residents @ $1,500.00) + (2 residents @ $1,600.00) ] for 21 months (April 1, 1990 through Dec. 31, 1991) — $382,200.00

$22,200.00 [ (10 × $1,800.00) + (2 × $2,100.00) ] × 5 mos. (1/1/92–5/31/92) — 111,000.00

$493,200.00

### 2. Actual Gross Revenue with 6 Residents

$9,100.00 [ (5 residents @ $1,500.00) + (1 resident @ $1,600.00) ] for 11 months (April 1, 1990 through February 28, 1991) — $100,100.00

$9,500.00 [ (5 × $1,600.00) + (1 × $1,500.00) ] × 2 mos. (3/1/91–4/30/91) — 19,000.00

$9,600.00 (6 × $1,600.00) × 8 mos. (5/1/91–12/31/91) — 76,800.00

$10,700.00 [ (5 × $1,800.00) + (1 × $1,700.00) ] × 1 mo. (1/92) — 10,700.00

$10,800.00 (6 × $1,800.00) × 4 mos. (2/1/92–5/31/92) — 43,200.00

$249,800.00

Gross Loss for 4/1/90–5/31/92 (subtract # 2 from # 1) — $243,400.00

### 3. Anticipated Increased Expenses

| | |
|---|---:|
| Liability Insurance | $ 500.00 |
| Workers Compensation | 1,000.00 |
| Payroll | 23,100.00 |
| Administrative Payroll | 10,000.00 |
| Payroll Taxes | 2,200.00 |
| Utilities | 100.00 |
| Food | 5,000.00 |
| Residential Activities | 300.00 |
| | $ 42,200.00 |

(Divided by 12) = $3,516.67 per month × 26 mos. of injury = — $ 91,433.00

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Gross Loss of $243,400.00 rounded to — $243,000.00
Minus Anticipated Increased Expenses of $91,433.00 rounded to — $ 91,000.00
Equals Smith & Lee's Claimed Damages — $152,000.00