SMITH & LEE ASSOCIATES, INC.; United States of America, Plaintiffs–Appellees,

v.

CITY OF TAYLOR, MICHIGAN, Defendant–Appellant.

No. 95–1231.

United States Court of Appeals, Sixth Circuit.

Argued April 11, 1996.

Decided Dec. 16, 1996.

---

Gregory J. Bator, argued, Bator & Zartarian, Birmingham, MI, for Smith & Lee Associates, Inc.

David K. Flynn, Gregory B. Friel, argued and briefed, U.S. Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, Barbara Burr, U.S. Department of Justice, Civil Rights Division, Washington, DC, L. Michael Wicks, Asst. U.S. Attorney, Office of the U.S. Attorney, Detroit, MI, for U.S.

Patrick B. McCauley, Patrick J. Burkett, argued and briefed, Sommers, Schwartz, Silver & Schwartz, Southfield, MI, for City of Taylor, Mich.

David M. Davis, briefed, Hardy, Lewis & Page, Birmingham, MI, for amicus curiae Michigan Municipal League.

Before: KENNEDY and SILER, Circuit Judges; ALDRICH, District Judge.*

KENNEDY, J., delivered the opinion of the court, in which SILER, J., joined. ALDRICH, J. (pp. 799–804), delivered a separate opinion concurring in part and dissenting in part.

KENNEDY, Circuit Judge.

The City of Taylor, Michigan appeals the District Court's judgment that the City violated the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3604(f)(1)(B) & (3)(B), by intentionally discriminating against and failing to make reasonable accommodations for the handicapped. The City also appeals the Court's order requiring the City to amend its zoning ordinance, pay an adult foster care home $284,000 in damages, and pay a $20,000 fine. For the following reasons, we affirm in part and reverse in part.

* The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

## I

Smith & Lee Associates, Inc. ("Smith & Lee") is a for-profit Michigan corporation that owns and operates Adult Foster Care ("AFC") homes in the State of Michigan. AFC homes provide twenty-four hour supervised care to dependent adults who require ongoing supervision but not continuous nursing care. Smith & Lee was organized for the purpose of purchasing the residential home at dispute in this case, Mortenview Manor ("Mortenview"), in Taylor, Michigan ("the City" or "Taylor").

Mortenview specializes in care for the elderly disabled. It houses six elderly disabled residents who suffer from Alzheimer's disease and other forms of dementia, organic brain syndrome, and other ailments. Whereas other AFCs known as "contract" homes, which house persons with other types of disabilities, receive subsidies from state or community social service agencies, homes for the elderly disabled like Mortenview must rely solely on payments from their residents to cover operating costs. Mortenview is a one-story dwelling that includes a kitchen, living room, dining room, six bedrooms, two full baths, and a small office; its circular driveway provides parking for visitors and staff.

Mortenview is located in a residential neighborhood in Taylor that is zoned for single-family use. Smith & Lee has authority to house six unrelated disabled adults in Mortenview by virtue of Mich. Comp. Laws Ann. § 125.583b(2) (West 1986),[1] which permits AFC homes for six or fewer residents to operate in all residential zones, including single-family neighborhoods. Before an AFC facility may house more than six residents, however, it must receive the municipality's approval before Michigan will issue it a license.

From the time it purchased Mortenview, Smith & Lee sought to house twelve residents. Michael Manore, then Director of Taylor's Office of Development Services, informed Smith & Lee that the home could not operate with twelve residents unless the City rezoned the property from R–1A, which is the City's designation for single-family use, to RM–1, which is its designation for multiple-family use. The City issued Smith & Lee a building permit, albeit with an express limitation listed on the permit: "SINGLE FAMILY RESIDENTIAL USE ONLY." Smith & Lee's owners increased Mortenview's capacity from a three bedroom to a six bedroom ranch by converting the garage into additional bedrooms. After inspecting the home, the Michigan Department of Social Services ("MDSS") licensed Mortenview for six residents, and it opened in December of 1990.

In January of 1990, Smith & Lee petitioned the City to rezone Mortenview from R–1A to RM–1. Taylor officials referred the petition to the City's planning consultant, Wade/Trim Impact, which recommended that Smith & Lee's petition be denied for three reasons: (1) RM–1 zoning would be inconsistent with the established zoning pattern of the neighborhood; (2) RM–1 zoning would allow for land uses that are incompatible with the established single-family residential character of the neighborhood; and (3) the request was inconsistent with the City's Master Land Use Plan 2000.

On February 21, 1990, the City's Planning Commission held a public hearing on Smith & Lee's zoning proposal. No residents voiced objections to Smith & Lee's rezoning

---

1. That section provides:

> In order to implement the policy of this state that persons in need of community residential care shall not be excluded by zoning from the benefits of normal residential surroundings, a state licensed residential facility providing supervision or care, or both, to 6 or less persons shall be considered a residential use of property for the purpose of zoning and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone.

Mich. Comp. Laws Ann. § 125.583b(2) (West 1986).

petition. The Commission voted to recommend that the City Council deny Smith & Lee's petition. At a March 5, 1990 study session, the City Council discussed the petition. Smith & Lee advised the City Council members that denial of the rezoning petition might violate the Fair Housing Amendments Act. A representative of the Michigan Residential Care Association made a presentation on behalf of Smith & Lee and explained the potential impact of the federal statute. At its March 6, 1990 meeting, the Council denied the zoning request, citing spot zoning concerns and the proposal's incompatibility with the City's master development plan.

Relying on advice from an MDSS official, Marjorie Murrell, who informed Smith & Lee that the State would issue a license to Smith & Lee to operate a twelve-person AFC home if the City sent a letter indicating that it was not opposed, and that it was thus unnecessary for the City to actually rezone the Mortenview parcel, Smith & Lee sought such a letter from the City at a study session of the City Council, on March 19, 1990. The City Council did not accede to Smith & Lee's request that the letter proposal be brought up for a vote at the next City Council meeting, on March 20, 1990.

## II

On May 10, 1991, Smith & Lee brought suit alleging that the City had violated Section Six of the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3604(f)(1)(B) & (3)(B), by intentionally discriminating against and failing to make reasonable accommodations for the handicapped. The United States filed a similar action on June 28, 1991, and the suits were consolidated for trial.[2]

### A

After a bench trial, the District Court held that Taylor intentionally discriminated and failed to make reasonable accommodations. *United States v. City of Taylor, Mich.*, 798 F.Supp. 442 (E.D.Mich.1992).

2. The significant extent to which this appeal involves issues raised previously necessitates the lengthy procedural history section that follows.

In reaching its conclusion that Taylor had intentionally discriminated, the District Court found that Taylor's 1981 suit for declaratory judgment against the State, in which it sought to have a Michigan statute defining group homes of six or fewer residents as a family for zoning purposes[3] declared unconstitutional, was historical evidence of the City's discriminatory animus toward the handicapped. The Court also found that City officials' fears of increased traffic and parking problems, and their objections to spot zoning, were pretextual because the various officials offered very similar testimony:

> Th[e] constant repetition of the parking, police, fire and zoning matters seriously destroyed the credibility of all members of the City Council who testified.

*City of Taylor*, 798 F.Supp. at 447. It also noted the City's failure to commission studies on the actual impact of a twelve-person AFC home on parking and traffic.

The Court also found that the City had set up procedural roadblocks when it informed Smith & Lee that it would have to get the City Council to rezone the Mortenview property from single-family to multiple-family use. Mortenview did not necessarily need to be rezoned, the Court noted, because the ordinance did not expressly mention AFC homes. The Court believed that Mortenview was ineligible for R–1A zoning only because of its for-profit status. Yet, the Court noted, the City tolerated other for-profit home businesses on the same street and in the same area.

The Court also found that Taylor had failed to make reasonable accommodations. The Court rejected the City's fears about increased traffic and parking problems as having no basis in fact. The Court held that the City simply could have sent a letter informing MDSS that it was not opposed to Smith & Lee's proposal to operate Mortenview as a twelve-person AFC home.

3. Mich. Comp. Laws Ann. § 125.583b(2) (West 1986).

The Court ordered the City to send such a letter to MDSS. It also ordered Taylor to pay a $50,000 fine to the United States and to pay Smith & Lee $152,000 for profits it would have earned had the City permitted it to operate with twelve residents.

## B

After the City appealed, a panel of this Court reversed and remanded the action for further proceedings. *Smith & Lee Assoc., Inc. v. City of Taylor, Mich.*, 13 F.3d 920 (6th Cir.1993).[4] After noting that local municipalities have wide-ranging discretion in regulating land use, we held that the City zoning ordinance's definition of family,[5] which excluded Smith & Lee's operation of a for-profit AFC home housing more than six residents in an area zoned for single-family use, was "a constitutional exercise of its legislative discretion to zone a residential neighborhood." *Smith & Lee*, 13 F.3d at 925.

We held that the District Court had erred in viewing the City's interpretation of the non-profit requirement in its definition of family as evidence of intentional discrimination; the City's interpretation was proper and reasonable under the ordinance as written. Similarly, we held that the Court erred by considering Taylor's advice to Smith & Lee to seek a zoning change from single-family to multiple-family use as evidence of intentional discrimination; that advice was appropriate in light of the language of the ordinance. We also held that it was not discriminatory to advise Smith & Lee to seek a zoning change to multiple-family use when multiple-family areas do not on their face allow twelve-person AFC homes; in such areas, "homes for the elderly as well as convalescent and nursing homes are permitted as special uses...." *Id.* at 926.

With respect to the Court's finding that Taylor was enforcing its non-profit requirement against Mortenview but not other home businesses in the same vicinity, we noted that "[t]he District Court did not address whether the City's enforcement of the non-profit requirement against Smith & Lee, while permitting other for-profit businesses to operate in the same single-family block, is an unequal and unconstitutional application of its zoning ordinance." *Id.* at 927. Accordingly, we instructed the Court to consider on remand whether Mortenview was similarly situated with other home businesses in the area and to determine the extent to which the City had knowledge of these other alleged zoning violations.

We tentatively sanctioned the District Court's consideration of Taylor's 1981 declaratory judgment suit to strike down Mich. Comp. Laws Ann. § 125.583b(2) as historical evidence of Taylor's discriminatory animus toward the handicapped. But we emphasized that such evidence was "remote," and we held that the District Court abused its discretion when it excluded evidence that in 1984 the City had rezoned a property from single-family to multiple-family to accommodate a twelve-person AFC home; such evidence, we noted, "was relevant to rebutting the historical evidence that the City has a

---

4. In dissent, Judge Contie argued that the evidence supported the District Court's finding that the City had intentionally discriminated against the handicapped and that the City had failed to show that it would be harmed by allowing Smith & Lee to operate a twelve-person AFC home in an area zoned for single-family use. *See Smith & Lee*, 13 F.3d at 933, 933–34 (Contie, J., dissenting).

5. Taylor defines family as follows:
"a. an individual or group of two or more persons related by blood, marriage, or adoption, together with foster children and servants of the principal occupants, with not more than one (1) additional unrelated person who are domiciled together as a single, domestic, housekeeping unit in a dwelling unit, or

b. A collective member [sic] of individuals domiciled together in one (1) dwelling unit whose relationship is of a continuing nontransient domestic character and who are cooking and living as a single nonprofit housekeeping unit. This definition shall not include any society, club, fraternity, sorority, association, lodge, coterie, [or] organization...."
City of Taylor Zoning Ordinance, § 2.02(36). Since subsection a. applies only to related family members, Smith & Lee would be eligible only under subsection b. However, subsection b. is limited to households operating "as a single nonprofit" unit. Since Mortenview operates as a for-profit entity housing unrelated adults, it falls outside Taylor's definition of family.
Taylor's definition of family predated this controversy.

history of discriminating against the handicapped." *Id.* at 928.

Finally, we held that the District Court erred in finding evidence of intentional discrimination in various City officials' testimony. First, even though one City Councilman's rationale for denying the zoning change—fear for the safety of residents during a fire—could be evidence of paternalism toward the handicapped, that view was not espoused by any other member of the City Council. Second, the Court erred by concluding that the mere similarity of council members' stated reasons for denying Smith & Lee's petition meant that those reasons were pretextual: "The reasons that were given by the Council members ... are the reasons most zoning laws are enacted and the reasons upheld by courts in Fifth Amendment taking challenges to zoning laws." *Id.* at 928.

Proceeding to the reasonable accommodation issue, we held that the Court erred when it instructed Taylor to send a letter informing state officials that it had no objection to Smith & Lee operating Mortenview as a twelve-person AFC. The Council lacked authority to amend its zoning ordinances simply by sending a letter: "The Council, an elected body, was required to act in accordance with its required procedures. [T]hat the state was willing to accept a letter whether or not the Council had authority to give one does not enlarge the Council's authority." *Id.* at 929–30.

We remanded for the District Court to decide whether AFCs in the Taylor area needed an accommodation and whether a given accommodation was reasonable. We instructed the Court to consider whether otherwise legitimate zoning rules, such as a six-person occupancy limit on for-profit AFCs, denied equal opportunity by guaranteeing such a low rate of return for investors that AFC homes would be unavailable. We emphasized that "the inquiry should not be whether a particular profit-making company needs an accommodation but, rather, do such businesses as a whole need this accommodation." *Id.* at 931.

Finally, we struck down the $50,000 fine on the grounds that the District Court had provided "no reasons as to why it imposed the maximum penalty of $50,000" and because "[t]he law as to what accommodation is required is too uncertain to penalize the City's conduct." *Id.* at 932. Indeed, we noted that "[i]n view of our disposition of the issues raised in this appeal, we see no basis for a penalty." *Id.*

## C

Upon remand, and after hearing five weeks of additional evidence, the District Court reaffirmed its finding that Taylor intentionally discriminated and failed to make reasonable accommodations. *United States v. City of Taylor, Mich.,* 872 F.Supp. 423 (E.D.Mich.1995).

The District Court based its finding that the City intentionally discriminated against the handicapped on four considerations: that the City characterized AFC homes as a multiple-family use without inquiring into such homes' similarity to families; that the City enforced the ban on for-profit uses against Mortenview even though it tolerated other home businesses in the immediate area; that City officials' comments reflected a paternalistic and discriminatory attitude toward the handicapped; and that the City's 1981 declaratory judgment suit to prevent another AFC home from operating was historical evidence of the City's discriminatory animus— evidence that was not rebutted by the City's willingness to rezone another twelve-resident AFC facility from single-family to multiple-family use. *Id.* at 436.

The Court also held that the City had failed to make reasonable accommodations. The Court found that "AFC homes are often the only means by which disabled adults are able to live in single-family type homes in residential communities," *id.* at 426,[6] a find-

---

6. The District Court also found that the elderly disabled receive significant medical benefits from living in AFC homes situated in single-family residential neighborhoods:

[E]xtensive trial testimony revealed that the small, family-like atmosphere created in an AFC home located in a single family neighborhood was not merely desirable, but medically beneficial to elderly adults suffering from vari-

ing given this Court's imprimatur in the first appeal. *See Smith & Lee*, 13 F.3d at 931 (noting that "the handicapped may have little choice but to live in a commercial home if they desire to live in a residential neighborhood.").

The Court found a shortage of AFC homes for the elderly disabled in the Taylor area. It found that there were only three AFC homes serving the elderly disabled and that only one of them, Mortenview, was located in a single-family neighborhood. *Id.* at 438. It also found that Mortenview has a waiting list of elderly disabled individuals who desire to live there. *Id.* Finally, the Court credited expert testimony that, over the next thirty-five years, the number of older adults living in the State of Michigan who suffer from dementia would increase by seventy-seven percent. *Id.*

The Court found that "the shortage of AFC homes for elderly disabled residents in the City of Taylor is caused, at least in part, by the fact that such homes are not economically viable with only six residents." *Id.* at 439. AFC homes for the elderly disabled are not economically viable when limited to six residents, the Court found, because such AFCs do not receive state subsidies to cover operating costs. *Id.* at 426. AFC homes serving the elderly disabled must make up for the relatively low per-resident contribution by increasing the number of residents. The Court relied on expert testimony offered by William F. Lasky, President and CEO of Alternative Living Services, a national provider of elderly assisted living facilities. As the government noted in its brief, Mr. Lasky testified that it is no longer economically feasible for AFC homes for the elderly disabled to operate with fewer than nine residents.

The Court then considered whether it would be reasonable to require Taylor to allow AFC homes for the elderly disabled to operate with twelve residents in areas zoned R–1A. The Court found that Taylor faced no significant financial or administrative burdens in accommodating Smith & Lee. It also found that such an accommodation would not fundamentally alter the residential nature of areas zoned for single family use because the residents at Mortenview live as a family:

> [they] eat meals together, watch television and play cards together, do activities together and have grown to care for and depend on one another. They are not transient roomers wandering through town; nor are they like wholly independent adults living in an efficiency apartment complex sharing the same physical space, but leading independent lives. They are most like a family, and they desire to live on streets like Mortenview Drive for all the same reasons their neighbors do as well as some unique reasons related to their medical handicaps and elderly status.

*Id.* at 443. As such, even with additional residents, Mortenview would function like any other single-family home in the neighborhood. For these reasons, the Court concluded that the requested accommodation was reasonable.

The Court awarded three forms of relief. First, it ordered the City to "amend its zoning ordinance within 30 days of the entry of final judgment in this case, by adding to the definition of family, Ordinance Section 2.02(36), the following:

> c. a group of not more than twelve unrelated elderly disabled persons, each of whom is handicapped with the meaning of the Fair Housing Act, 42 U.S.C. Sec. 3602(h), living together as a single housekeeping unit in an adult foster care home licensed by the State of Michigan, with

ous forms of dementia, such as Alzheimer's Disease. Dr. Robert Bernstein, a recognized expert in mental health and the residential needs of elderly adults with dementia, testified that AFC homes for fifteen or fewer residents provide a homelike setting that incorporates familiar environmental cues relating to orientation and daily living tasks. Because of this "environmental cuing," living in an AFC home, as opposed to a nursing home or other institutional housing, actually lessens the risk of functional decline for adults with dementia. Moreover, the quiet setting and familiar sights and sounds of a residential home with a backyard, a garden, and children playing nearby can help adults with Alzheimer's and other forms of dementia to avoid disabling confusion and to participate in community life.

*City of Taylor*, 872 F.Supp. at 426–27.

such nonresident staff as may be needed to assist the residents with their daily life activities, but not receiving funding through a contract with any State or community health or social service agency."

*Id.* at 443.

Second, the Court reimposed a fine against the City but reduced the amount from $50,000 to $20,000. The Court believed that the City should be fined because it had both intentionally discriminated and failed to make reasonable accommodations. The Court was "particularly incensed by the City's failure to make any meaningful inquiries into the purpose and function of AFC homes before characterizing them as multiple-family uses and segregating them from single-family neighborhoods," *id.* at 444, when it did allocate time looking for alternative, but, in the Court's view, unsatisfactory sites for twelve-person AFCs in areas zoned for multiple-family use. Finally, the Court acknowledged that "prior to this case, the law in this circuit on the duty to accommodate was somewhat ambiguous." *Id.* But it was important to send "a strong message to the numerous municipalities likely to face similar issues in the near future." *Id.*

Third, the Court awarded Smith & Lee $284,000, "which represent lost revenue through October 31, 1994 if Smith & Lee had been permitted to operate Mortenview Manor with twelve residents as of April 1, 1990." *Id.*

## III

Section Six of the Fair Housing Amendments Act of 1988, P.L. 100–430, 102 Stat. 1620, 42 U.S.C. § 3604(f)(1) makes it unlawful

to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter,

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

Moreover, it defines discrimination to include

a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

42 U.S.C. § 3604(f)(3)(B).

■ Plaintiffs who allege a violation of 42 U.S.C. § 3604(f) may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodations. *E.g. Oak Ridge Care Center, Inc. v. Racine County, Wis.*, 896 F.Supp. 867, 874 (E.D.Wis.1995). Smith & Lee and the United States have alleged claims under the first and third theories.

## A

■ We begin by considering the District Court's finding that Taylor intentionally discriminated against the handicapped. In this case, plaintiffs may show disparate treatment by proving that the City would have approved Smith & Lee's rezoning petition but for discriminatory animus toward the handicapped. Plaintiffs must show that "discriminatory purpose was a motivating factor" in the City's decision to deny Smith & Lee's petition. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 270, 97 S.Ct. 555, 566, 50 L.Ed.2d 450 (1977).

■ Although Taylor had no duty to approve Smith & Lee's zoning petition to spot zone Mortenview Manor from RM–1 to R–1A, the City could not lawfully deny the petition because of its City Council members' discriminatory animus toward the handicapped. As the Supreme Court has noted, "discrimination is not just another competing [legislative] consideration." *Arlington Heights*, 429 U.S. at 265, 97 S.Ct. at 563, *citing* Paul Brest, Palmer v. Thompson: *An Approach to the Problem of Unconstitutional Legislative Motive*, 1971 Sup.Ct. Rev. 95, 116–18. Otherwise lawful governmental actions become unlawful when done for the purpose of disadvantaging the handicapped. *See, e.g., United States v. City of Parma,*

*Ohio,* 494 F.Supp. 1049, 1099 (N.D.Ohio. 1980), *aff'd,* 661 F.2d 562 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982) (footnotes omitted) ("Actions which are typically lawful, such as ... a locality's decision not to apply for federal assistance in housing, [or] a community's refusal to promote low-income housing, lose that character when they are undertaken for a discriminatory purpose.").

Smith & Lee need not prove that Taylor's action "rested solely on ... discriminatory purposes," for "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights,* 429 U.S. at 265, 97 S.Ct. at 563; *see also United States v. City of Parma, Ohio,* 661 F.2d 562, 575 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982) ("There is no requirement that ... intent be the sole basis of official action, if it is a motivating factor.").

■ Once plaintiffs show that defendant's decision was motivated at least in part by discriminatory animus, the burden shifts to the defendant to prove that it would have made the same decision even if it had not been motivated by an unlawful purpose:

> Proof that the decision ... was motivated in part by a ... discriminatory purpose would not necessarily have required invalidation of the challenged [legislative action]. Such proof would ... have shifted to the [municipality] the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered.

*Arlington Heights,* 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21; *see also Mt. Healthy City School District Bd. of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (holding that the district court "should have gone on to determine whether [defendant] had shown by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct.").

The District Court commenced its analysis of plaintiffs' intentional discrimination claim by stating: "[t]o prove that Taylor engaged in intentional discrimination ... plaintiffs need only show that discriminatory animus was a 'motivating factor' for Taylor's action." *City of Taylor,* 872 F.Supp. at 429. But the Court did not specify which "action" it believed was motivated by discriminatory animus. Instead, it looked at a variety of City actions and appeared to treat each as a separate instance of intentional discrimination.

■ We believe the relevant City "action" is the City Council's denial of Smith & Lee's rezoning petition on March 6, 1990.[7] Thus, we must determine whether the City Council's decision to deny Smith & Lee's petition was motivated in part by discriminatory animus toward the handicapped. Although the District Court did not follow this approach exactly, it noted that

> evidence of Taylor's intentional discrimination against the handicapped is found in: (1) The City's unsupported characterization of a mid-sized AFC home as a "multiple-family" use; (2) The City's disparate application of its zoning ordinance among AFC homes and other homes; (3) Paternalistic and other discriminatory statements made by Taylor officials about Mortenview Manor's elderly disabled residents; and (4) Evidence of historical discrimination against the handicapped which was not substantially rebutted by the City's decision to rezone another twelve-resident AFC home from single-family to multiple-family zoning.

*City of Taylor,* 872 F.Supp. at 429. We shall determine whether those four considerations offer inferential proof that the City Council's decision on March 6, 1990 to deny Smith & Lee's zoning petition was motivated by discriminatory animus toward the handicapped. We believe this approach is faithful to the

7. The City Council's refusal to consider Smith & Lee's proposal to send a letter to MDSS stating that the City was not opposed to Mortenview being operated as a twelve-person AFC home cannot serve as evidence of intentional discrimination. As we noted in the first appeal, the City had no authority to waive its zoning ordinance merely by sending such a letter. The City cannot be found to have intentionally discriminated for not doing something it had no power to do.

guidance offered by the Supreme Court in *Arlington Heights*. *See* 429 U.S. at 266, 97 S.Ct. at 564 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.").

We do not believe that Taylor's characterization of twelve-person AFC homes as a multiple-family use stands as inferential proof of discriminatory animus toward the handicapped. As we noted in our prior opinion, "[t]he [district] court was not justified in concluding that the Taylor officials discriminated in their interpretation of the ordinance." *Smith & Lee*, 13 F.3d at 926. We find error on this basis again here. Taylor's zoning ordinance existed before this dispute began, and there is no suggestion that the ordinance was passed specifically to exclude handicapped residents from single-family areas. *See Arlington Heights*, 429 U.S. at 270, 97 S.Ct. at 566 ("The Village originally adopted its buffer policy long before MHDC entered the picture and has applied the policy too consistently for us to infer discriminatory purpose from its application in this case."). The City's interpretation of the ordinance cannot serve as evidence of intentional discrimination unless the City's interpretation strained the plain meaning of a statute to further its discriminatory animus. No such allegation has been made here. Indeed, the ordinance is unambiguous, and the City's interpretation is quite reasonable. Thus, this is not like *Stewart B. McKinney Foundation, Inc. v. Town Plan and Zoning Comm'n of the Town of Fairfield*, in which the district court found that the Town's unreasonable interpretations of the terms "family" and "chronic nursing home care" constituted evidence of discriminatory animus. 790 F.Supp. 1197, 1213–16 (D.Conn.1992). Having assured itself that Smith & Lee's operation of Mortenview as a twelve-person for-profit AFC for the elderly disabled did not fall within Taylor's legal definition of family, it was not the District Court's function to inquire into the purpose or essential nature of single family neighborhoods and AFC homes to determine whether AFC homes in essence house single families.[8] When a statute has a transparently clear meaning, as does Taylor's definition of family, it is not necessary to determine whether something it specifically excludes nonetheless falls within its purpose or spirit. *See* Cass R. Sunstein, *Problems with Rules*, 83 Cal. L.Rev. 953, 972 (1995) ("[I]f decision-makers investigate the purpose for a rule before applying it, they convert the rule into something very close to a standard or set of factors.").

Nor do we believe that the City's treatment of home businesses offers proof of discriminatory animus toward the handicapped. Allowing single-family homeowners to operate home businesses while at the same time prohibiting Smith & Lee from operating Mortenview as a twelve-person AFC home because Smith & Lee was a for-profit entity does not constitute disparate treatment or evidence of discriminatory animus. Taylor's zoning ordinance specifically permits homeowners in single-family neighborhoods to run a home business.[9] The District Court should

---

8. Such an inquiry was, however, appropriate in determining, in the accommodation context, whether allowing AFCs to house more than six unrelated adults in a single family neighborhood was unreasonable because it required a fundamental alteration in the City's zoning policies.

9. Section 4.02(5) of Taylor's Zoning Ordinance permits as a principal use in single-family residential districts "Home occupations as defined in Section 2.02." That Section defines home occupations as

[a]ny use customarily conducted entirely within the dwelling and carried on by the inhabitants thereof, not involving employees other than members of the immediate family residing on the premises, which use is clearly incidental and secondary to the use of the dwelling for dwelling purposes, does not change the character thereof, and which does not endanger the health, safety, and welfare of any other persons residing in that area by reasons of noise, noxious odors, unsanitary or unsightly conditions, excessive traffic, fire hazards and the like, involved in or resulting from such occupation, profession, or hobby. Activities not deemed to be home occupations include, among others, medical clinics, hospitals, barber shops, nurseries, day medical clinics, day care centers, beauty parlors, tea rooms, veterinarian's offices, tourist homes, animal hospitals, kennels, offices of insurance and real estate agents, lawyers, doctors, accountants, and millinery shops.

City of Taylor Zoning Ordinance, § 2.02(42).

not have based a finding of intentional discrimination on a comparison of City's treatment of home businesses with its treatment of Mortenview. Under the terms of the Zoning Ordinance, Mortenview did not fit under the definition of single family, nor did it fit under the definition of home occupation. The language of the home occupation exception excludes homes like Mortenview because Smith & Lee's partners do not live there and because the exception is expressly limited to home occupations "which use is clearly incidental and secondary to the use of the dwelling for dwelling purposes...." Housing elderly disabled residents is *not* "secondary to the use of the dwelling for dwelling purposes." As Mortenview is simply not comparable to single-family homes whose owners run a home business, the City's refusal to allow Smith & Lee to operate Mortenview as a twelve-person for-profit AFC home cannot serve as the basis of a disparate treatment claim. For the same reason, the City's alleged failure to require certain home businesses to comply with the City's ban on large signs cannot serve as evidence of disparate treatment or discriminatory evidence.[10]

▆ We are also not convinced that plaintiffs produced significant evidence of discriminatory or paternalistic statements regarding the handicapped. The District Court noted that at the first trial, the Chairman of the City Council stated his belief that AFC homes would have a negative impact on single-family neighborhoods by lowering surrounding property values. The Court also noted that at the second trial the Mayor of Taylor "admitted that some of the City's initial opposition to AFC homes was based on irrational fears and prejudices about the dangerous or unstable nature of AFC residents." *City of Taylor*, 872 F.Supp. at 435. Further, the Court pointed to testimony by Gerald Couch, the City's Executive Director for Developmental Services, who, according to the Court, testified on remand that he felt it was

his duty to protect Taylor's single family homeowners from AFC homes in their neighborhoods. Finally, the Court noted that at the first trial, the City Council Chairman betrayed a paternalistic attitude toward the handicapped when he testified that he opposed allowing a twelve-person AFC to operate in a single-family neighborhood because of his fear for the residents' safety during a fire. AFCs must pass stringent fire inspections. Moreover, such safety concerns were not "related to the home's presence in a single-family residential neighborhood," *id.*, for the same safety concerns would apply to AFCs in single-family *and* multiple-family neighborhoods.

We continue to believe that the views expressed by the City Council Chairman regarding the safety of AFC residents during a fire were "the position of only one member of the Council." *Smith & Lee*, 13 F.3d at 928. We also believe that a city council member's fears that a twelve-person AFC might lower surrounding property values, even if proved to be unwarranted, do not necessarily evince discriminatory animus toward the handicapped. Moreover, the Mayor's comments were directed toward the City's behavior regarding an AFC home roughly ten years before this dispute, not Mortenview. The Mayor's testimony that the City had been opposed to AFC homes ten years before this dispute offers only weak evidence that the City was motivated by discriminatory animus toward the handicapped when it denied Smith & Lee's petition. Indeed, the District Court noted that "after a decade of exposure to AFC homes with no negative results, Taylor City officials and residents no longer oppose the presence of the homes within the City." *City of Taylor*, 872 F.Supp. at 435. Thus, we do not believe that these comments, by themselves, are enough to support an inference that the City Council was motivat-

---

**10.** We remanded to the District Court the question of whether Taylor's treatment of home businesses and its failure to enforce strictly the home business requirements for other homes surrounding Mortenview made enforcement of the zoning ordinance against Mortenview discriminatory. The Court did not deal with this issue. Nevertheless, the fully developed factual record does

not demonstrate that the City of Taylor allowed others to use their property is such a similar, nonconforming manner that it cannot enforce its zoning ordinance against Smith & Lee. *See Township of Blackman v. Koller*, 357 Mich. 186, 98 N.W.2d 538 (1959); *Laramie & Son, Inc. v. Southfield Township Bldg. Inspector*, 326 Mich. 410, 40 N.W.2d 205 (1949).

ed by discriminatory animus when it denied the petition.

■ Finally, we continue to believe that what the District Court characterized as Taylor's abiding discriminatory animus is weak at best. The City's 1981 declaratory judgment suit to determine its rights and responsibilities under Mich. Comp. Laws Ann. § 125.583b(2) has a very attenuated relationship to the present dispute. It is not enough, by itself, to support an inference that the City's decision roughly ten years later to deny Smith & Lee's rezoning petition was motivated in part by discriminatory animus.

For these reasons, we do not believe the four considerations mentioned by the District Court support its finding that Taylor's City Council was motivated in part by discriminatory animus toward the handicapped when it denied Smith & Lee's petition.

■ Nevertheless, even if the District Court did not err in finding that the decision was motivated in part by discriminatory animus, its overall finding that Taylor intentionally discriminated against the handicapped is in error, for it is abundantly clear that the City Council would have denied the petition even if it had not been motivated by an unlawful purpose. Once plaintiffs establish that a defendant was motivated by discriminatory animus, defendant must be given the opportunity to prove by a preponderance of the evidence that it would have reached the same decision even if it had not been influenced by discriminatory animus. *See Arlington Heights*, 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21; *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. The City Council members all testified that they were opposed to Smith & Lee's petition because, as a rule, they are opposed to spot zoning. According to the District Court,

> [e]ach [City official] who testified voiced a fundamental opposition to "spot zoning." They explained that even if Smith & Lee's use of the Mortenview property was not inconsistent with the surrounding property uses, a rezoning of the land could result in future inconsistent uses over which the City would have no control. All witnesses viewed this inability to control the future

use of the rezoned property as a burden to the City and a significant interference with its zoning powers.

*See City of Taylor*, 872 F.Supp. at 441. Significantly, the District "Court accept[ed] the City's objections to 'spot zoning'...." *Id.* Since Smith & Lee's rezoning petition required that the Mortenview parcel be spot zoned, and since the City Council members were strongly opposed to spot zoning, the evidence is clear that the City Council would have voted to deny Smith & Lee's petition even if it lacked discriminatory animus toward the handicapped.

In sum, we believe the District Court's finding that the City's decision to deny Smith & Lee's zoning petition was motivated by discriminatory animus is erroneous. Moreover, we find that even if the Court's finding were not erroneous, plaintiffs' intentional discrimination claim fails because the City would have taken the same action in the absence of discriminatory animus.

## B

Next, we consider the District Court's finding that Taylor violated the FHAA by failing to make reasonable accommodations. We begin by defining the three operative elements of 42 U.S.C. § 3604(f)(3)(B): "equal opportunity," "necessary," and "reasonable."

■ With respect to the phrase "equal opportunity," the House Report on the Act offers relevant context:

> The Fair Housing Amendments Act, like Section 504 of the Rehabilitation Act of 1973, as amended, is a clear pronouncement of a national commitment to *end the unnecessary exclusion of persons with handicaps from the American mainstream.*

House Comm. on the Judiciary, Fair Housing Amendments Act of 1988, H.R.Rep. No. 711, 100th Cong., 2d Sess. 18, *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179 (footnote omitted) (*hereinafter* 1988 U.S.C.C.A.N.) (emphasis added). We find persuasive the analysis of courts that define equal opportunity under the FHAA as giving handicapped individuals the right to choose to live in single-family neighborhoods, for that right serves to end

the exclusion of handicapped individuals from the American mainstream:

> [T]he Act prohibits local governments from applying land use regulations in a manner that will exclude people with disabilities entirely from zoning neighborhoods, particularly residential neighborhoods, or that will give disabled people less opportunity to live in certain neighborhoods than people without disabilities.

*Bryant Woods Inn, Inc. v. Howard County, Md.*, 911 F.Supp. 918, 946 (D.Md.1996) (citation omitted); *see also City of Edmonds v. Washington State Bldg.Code Council*, 18 F.3d 802, 806 (9th Cir.1994), *aff'd*, —— U.S. ——, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) ("Congress intended the FHAA to protect the right of handicapped persons to live in the residence of their choice in the community."). Moreover, the phrase "equal opportunity," at least as used in the FHAA, is concerned with achieving equal results, not just formal equality. *See City of Edmonds*, 18 F.3d at 806 ("The FHAA imposes an *affirmative duty* to reasonably accommodate handicapped people.") (emphasis added); *Proviso Ass'n of Retarded Citizens v. Village of Westchester, Ill.*, 914 F.Supp. 1555, 1563 (N.D.Ill.1996) (rejecting city's argument that "because Plaintiffs are subject to requirements imposed on all groups of unrelated non-disabled people, they have an 'equal opportunity' to live in the . . . dwelling").

▮ The statute links the term "necessary" to the goal of equal opportunity. *See* 42 U.S.C. § 3604(f)(3)(B) ("accommodation . . . necessary to afford . . . equal opportunity"). Plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice. *See Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir.1995) ("[T]he concept of necessity requires at a minimum the showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability."). Thus in the first appeal, we remanded for the District Court to consider whether an accommodation was necessary to enable investors to develop AFC homes. *See Smith & Lee*, 13 F.3d at 931; *see also Brandt v. Village of Chebanse, Ill.*, 82 F.3d 172, 174 (7th Cir.1996) (noting that, for the handicapped, "joint living arrangements are essential, [and] some minimum size may be essential to the success of the venture").

Finally, with respect to what constitutes "reasonable," the House Report notes that "[t]he concept of 'reasonable accommodation' has a long history in regulations and case law dealing with discrimination on the basis of handicap." 1988 U.S.C.C.A.N., *supra*, at 2186. In a footnote at the end of that sentence, the House Report cites *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), which interpreted Section 504 of the Rehabilitation Act. As several courts have noted, the House Report's numerous references to Section 504 indicate that Congress intended courts to apply the line of decisions interpreting "reasonable accommodations" in Section 504 cases when applying the FHAA. *See, e.g., Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 334 (2d Cir.1995); *City of Edmonds*, 18 F.3d at 806. Under *Davis*, an accommodation is reasonable unless it requires "a fundamental alteration in the nature of a program" or imposes "undue financial and administrative burdens." 442 U.S. at 410, 412, 99 S.Ct. at 2369, 2370. As the Seventh Circuit has noted, "cost (to the defendant) and benefit (to the plaintiff) merit consideration as well." *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir.1995). Indeed, in the first iteration of this appeal, we noted that "[w]e balance the City's interests against the need for an accommodation in this case." *Smith & Lee*, 13 F.3d at 931.

▮ With these considerations in mind, we believe the District Court did not err when it concluded that the evidence established that Mortenview and other AFCs for the elderly disabled in Taylor need an accommodation and that the requested accommodation is reasonable. As we noted in the first appeal, elderly disabled citizens have a right to live in Taylor's single-family neighborhoods. *See Smith & Lee*, 13 F.3d at 931.

Second, to avail themselves of this right, Taylor's elderly disabled need an accommodation. Because the elderly disabled can no longer live independently, AFC homes often provide the only means by which this popula-

tion can continue to live in residential neighborhoods. AFC homes for the elderly disabled in Taylor are in insufficient supply, in part, because, unlike contract AFC homes, which receive state subsidies, AFCs for the elderly disabled must rely solely on residents' payments to meet operating costs. Evidence at trial established that, in Taylor, Michigan, a six-person occupancy limit on for-profit AFCs serving the elderly disabled guarantees a negligible or negative rate of return for investors. As such, the demand for AFCs for the elderly disabled, which is projected to increase precipitously over the next three decades, now outstrips the existing supply of such homes. Thus AFC homes for Taylor's elderly disabled will remain in short supply unless the City allows them to operate with nine residents.[11]

Third, allowing AFCs housing nine elderly disabled residents to operate in Taylor's single-family neighborhoods is reasonable. Michigan already permits AFC homes to operate with six or fewer residents in areas zoned for single-family use. See Mich. Comp. Laws Ann. § 125.583b(2) (West 1986). We are not convinced that an additional three residents will fundamentally alter the nature of single-family neighborhoods. The residents of AFC homes live like most of the other families in their neighborhoods. They eat together, and they rely on each other for social activities and succor. Moreover, as none of Mortenview's elderly disabled residents drive, traffic and parking problems should not significantly increase with three more residents. Weighing the benefits to the elderly disabled against the cost to Taylor, we conclude that permitting AFC homes for the elderly disabled to operate with nine residents in neighborhoods zoned for single family use is a reasonable accommodation.

11. We emphasize that our holding is premised on the particular factual situation in the City of Taylor. AFC homes serving other populations or operating in other municipalities may not need the type of accommodation provided here. Plaintiffs bear the burden of demonstrating that the desired accommodation is necessary to afford equal opportunity. See Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir.1995).

12. Moreover, the District Court did not, as Taylor claims, err by allowing Smith & Lee to use

Nevertheless, Taylor argues that since other AFC homes operate profitably with six or fewer residents, Taylor should not be required to allow more than six residents to occupy an AFC in a single-family neighborhood. Taylor also argues that the District Court violated the law of the case doctrine by narrowing the analysis from whether AFCs must house more than six residents to be economically viable to whether AFCs serving the elderly disabled need more than six residents.

We do not believe the District Court erred. Mortenview does not receive the kinds of government subsidies and insurance payments that other AFC homes serving different populations receive. Accordingly, the District Court concluded that "the economic viability of 'non-contract' homes like Mortenview Manor cannot be fairly compared to that of 'contract' AFC homes receiving external financial support." City of Taylor, 872 F.Supp. at 437. Given that, in the first appeal, we instructed the District Court to consider the particularities of the market and the particular types of market participants, the District Court's decision to focus its inquiry on the elderly disabled was appropriate.[12]

## C

Finally, we consider the three forms of relief awarded by the District Court. The Court ordered Taylor to adopt the Court's definition of family, pay Smith & Lee $284,-000 in lost profits, and pay a $20,000 fine.

### 1

First, the District Court exceeded its proper scope of authority when it ordered Taylor to amend its zoning ordinance by

different figures in calculating lost revenues than it used to calculate Mortenview's profitability. Although the District Court relied on a $2,200 per month figure to compute Smith & Lee's lost revenue, it used that figure for only two of the twelve presumptive residents and only for the ten months between January 1, 1994 and October 31, 1994. It relied on a figure of $1,900 per resident per month for the other ten residents it would have had if Mortenview had been allowed to operate with twelve residents.

adopting the Court's definition of family, which permits twelve-person for-profit AFCs for the elderly disabled to operate in single-family neighborhoods. Our Court has had occasion to remind district courts that Article III powers are finite. In *Joseph Skillken & Co. v. City of Toledo*, we noted:

> Federal Courts do have jurisdiction and power to pass upon the constitutionality of Acts of Congress, but we are not aware of any decision extending this power in Federal Courts to order Congress to enact legislation. To do so would constitute encroachment upon the functions of a legislative body and would violate the time-honored principle of separation of powers of the three great departments of our Government. This principle is equally applicable to the power of a Federal Judge to order a state legislative body to enact legislation. The enactment of legislation is not a ministerial function subject to control by mandamus, prohibition or the injunctive powers of a court.

528 F.2d 867, 878 (6th Cir.1975), *vacated and remanded sub. nom. Joseph Skilken & Co. v. City of Toledo, Ohio*, 429 U.S. 1068, 97 S.Ct. 800, 50 L.Ed.2d 786 (1977), *decision adhered to on remand*, 558 F.2d 350 (6th Cir.1977), *cert. denied*, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977). Although the District Court could have enjoined Taylor from enforcing those provisions of its zoning ordinance that violated the FHAA, it did not have power to order Taylor to pass the Court's own amendment. The choice of how to comply with this opinion by accommodating the elderly disabled rests with the City Council, not the Court.

### 2

■ The District Court also erred in determining Smith & Lee's damages. After the first appeal, we remanded for the District Court to determine the number of residents an AFC home must be allowed to house to generate a rate of return sufficient to ensure that a reasonable number of such homes is developed. During the second trial, plaintiffs' expert witness, William Lasky, testified that AFCs housing the elderly disabled population are only marginally profitable when they house fewer than nine residents. Having heard expert testimony that AFCs are profitable with nine residents, the District Court erred when it computed damages by calculating the profits Smith & Lee would have earned had the City allowed it to operate with twelve, not nine, residents, for the extra profits associated with twelve residents are not necessary to provide the elderly disabled an equal opportunity to enjoy the housing of their choice.[13]

We have held that Taylor must accommodate the handicapped by permitting AFC homes to operate with nine or fewer elderly disabled residents in neighborhoods zoned for single-family use. But since Taylor is not obligated to allow AFCs of more than nine elderly disabled residents to operate in such neighborhoods, we remand for the District Court to recalculate Smith & Lee's lost profits on the basis of nine residents. *See Turning Point, Inc. v. City of Caldwell*, 74 F.3d 941, 945 (9th Cir.1996) (remanding to district court to recalculate damage award on the basis of 25 residents when district court had based its award on average occupancy of 35 residents).

### 3

■ Finally, we vacate the $20,000 fine against Taylor. When we heard Taylor's first appeal, we reversed the District Court's

13. Given that in 1994 only one percent of all households in the United States comprised seven or more persons, *see* United States Dep't of Commerce, Bureau of the Census, Statistical Abstract of the United States 58 (1995), and that the City's Master Land Use Plan 2000 indicates that average family size in Taylor in 1990 was 2.84 persons, a rule requiring municipalities to allow AFCs to operate with twelve residents in areas zoned for single-family use might substantially alter the nature of such neighborhoods. The potential impact of a twelve-person AFC facility would be magnified now that Michigan may no longer disperse AFC homes throughout communities by refusing to license a proposed AFC home located within a 1,500 feet radius of an existing AFC home. *See Larkin v. State of Michigan Dep't of Social Servs.*, 89 F.3d 285 (6th Cir.1996).

Courts must inevitably draw lines. Although a nine-resident AFC home would not substantially alter the residential character of a single-family neighborhood, a twelve-resident AFC home is more likely to do so.

$50,000 fine because it had not indicated its reasons for levying such a fine. We also noted that "[i]n view of our disposition of the issues raised in this appeal, we see no basis for a penalty." *Smith & Lee,* 13 F.3d at 932. On remand, the District Court lowered the penalty from $50,000 to $20,000. Despite this reduction, we believe it was an abuse of discretion to fine Taylor.

Having found that a defendant violated the FHAA, a court "may, to vindicate the public interest, assess a civil penalty against the respondent ... in an amount not exceeding $50,000 for a first violation...." 42 U.S.C. § 3614(d)(1)(C). The House Report offers relevant guidance:

> The court may ... assess civil penalties against a defendant up to a maximum of $50,000 for a first violation and $100,000 for any subsequent violations. As with civil penalties provided under Section 812(g), these are maximum, not minimum, penalties, and are not automatic in every case. When determining the amount of a penalty against a defendant the court should consider the nature and circumstances of the violation, the degree of culpability, any history of prior violations, the financial circumstances of that defendant and the goal of deterrence, and other matters as justice may require.

1988 U.S.C.C.A.N., *supra,* at 2201.

The District Court based its decision to impose a $20,000 fine on four considerations: that Taylor failed to accommodate and had intentionally discriminated; that the City had not made an effort to learn about AFC homes and the degree to which they operate as a single family unit before classifying them as a multiple-family use; that the City had recommended alternative sites for Mortenview outside neighborhoods zoned for single-families; and that a fine would serve as a deterrent to other municipalities considering accommodation requests.

We agree that courts should consider the nature of defendant's conduct when deciding whether a fine is warranted, and we further agree that a fine is especially appropriate when a defendant is found to have intentionally discriminated against the handicapped. But since we have concluded that the District

Court erred when it found that Taylor intentionally discriminated against the handicapped, and since we continue to believe that the state of the law regarding reasonable accommodations was unsettled at the time Smith & Lee brought its rezoning petition before the City Council in 1990, we do not believe a fine is appropriate here.

Moreover, the Court's second consideration, that the City failed "to make any meaningful inquiries into the purpose and function of AFC homes before characterizing them as multiple-family uses and segregating them from single-family neighborhoods," *City of Taylor,* 872 F.Supp. at 444, also does not justify a fine. As we noted above and in the first appeal, the City reasonably concluded that, under its zoning ordinance, twelve-person for-profit AFC homes could not operate in single-family neighborhoods. As such, it was not required to make further inquiries into what the District Court characterized as AFCs homes' true nature. Thus, the Court erred to the extent it based its penalty on this factor. Nor does the Court's displeasure with the City's efforts to identify alternative sites for twelve-person AFCs in areas zoned for multiple-family use justify a fine. The City had no duty to recommend alternative sites. That it chose to do so, and that the sites were not satisfactory to the District Court, has no bearing on the City's culpability.

Finally, we believe it is unfair to impose a fine in the hopes that making an example of Taylor will deter other municipalities from violating the FHAA, for they are not similarly situated to Taylor. Unlike future municipal defendants, who can consult numerous judicial interpretations of the FHAA to determine the scope of their legal obligations to the handicapped, Taylor's City Council considered Smith & Lee's rezoning petition when the law was still largely unsettled. Future municipal defendants who choose not to heed the now more comprehensible dictates of the FHAA would make better candidates for a fine than Taylor does.

## IV

For these reasons, we **REVERSE** the District Court's finding that the City intentional-

ly discriminated against the elderly disabled when it denied Smith & Lee's rezoning petition. We **AFFIRM** the Court's judgment that the City must allow AFC homes for the elderly disabled to operate in single-family neighborhoods, but we **REVERSE** to the extent the Court required Taylor to allow such homes to operate with more than nine residents. Accordingly, we **REMAND** the case for the Court to recalculate Smith & Lee's lost profits on the basis of nine, not twelve, residents. We also **VACATE** the Court's order requiring the City to adopt the Court's amendment to Taylor's zoning ordinance. Finally, we **VACATE** the $20,000 fine.

ANN ALDRICH, District Judge, concurring in part and dissenting in part.

I concur fully in parts I, II, III–B, III–C–1, and III–C–2 of Judge Kennedy's thorough and thoughtful opinion. I agree that the FHAA requires the city of Taylor to accommodate the elderly disabled by permitting AFC facilities for the elderly disabled to operate with nine or fewer residents in neighborhoods zoned for single-family use, but that it does not require the city to permit such facilities to operate with more than nine residents in such neighborhoods. Accordingly, I agree that the injunction should be vacated and that the case should be remanded for a recalculation of damages.

However, I must respectfully dissent from parts III–A and III–C–3 of the opinion, which conclude that the city of Taylor did not intentionally discriminate against the elderly disabled and that a civil penalty is not appropriate. Because I believe that the record amply supports the district court's finding of intentional discrimination and the imposition of a penalty, I would affirm those portions of the district court's decision.

### I.

As an initial matter, the majority does not address the proper standard of review. We may set aside the findings of fact of a district judge sitting without a jury only if those findings are clearly erroneous. Fed.R.Civ.P. 52(a). A finding of discriminatory intent is such a finding of fact. *Pullman–Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982). A finding is clearly erroneous only when, although there is evidence to support the finding, the reviewing court, after having reviewed all the evidence, is left with the definite and firm conviction that a mistake has been made. *Stevens v. McGinnis, Inc.,* 82 F.3d 1353, 1355–56 (6th Cir.1996) (citation omitted).

### II.

Here, the district court explicitly found that the city of Taylor's refusal to allow Mortenview Manor to expand was motivated by a discriminatory animus. *United States v. City of Taylor, Mich. (Taylor II),* 872 F.Supp. 423, 436 (E.D.Mich.1995). The majority opinion recharacterizes the issue as whether Taylor discriminated when it failed to rezone Mortenview. This describes the inquiry too narrowly. As the majority recognizes, the city had many ways of accommodating Mortenview when Smith & Lee petitioned for rezoning. For example, the city could have amended its zoning ordinance to provide an exception for AFC facilities. Thus, the real question is whether the city's failure to rezone *or otherwise accommodate* Mortenview's desire to expand was motivated by a discriminatory purpose.[1]

To constitute intentional discrimination against the handicapped, the city of Taylor's refusal to accommodate need not have been motivated solely, or even primarily, by a discriminatory animus. *See Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977). Rather, the plaintiffs must show that "discriminatory purpose was a motivating factor." *Id.* at 270, 97 S.Ct. at 566. Once the plaintiffs do so, the burden shifts to the defendants to show that they would have reached the same decision absent the discriminatory motive. *Id.* at 270 n. 21, 97 S.Ct. at 566 n. 21.

---

1. This is not to say that a failure to accommodate is always intentional discrimination. Rather, it simply means that a failure to accommodate may be intentional discrimination if it is motivated by a discriminatory animus.

Here, the district court relied on four different sources to conclude that the city was motivated by a discriminatory animus against the handicapped when it decided not to rezone or otherwise accommodate Mortenview: (1) the city's characterization of Mortenview as a "multiple-family" use; (2) the city's disparate application of its zoning ordinances; (3) paternalistic and discriminatory statements made by city officials; and (4) evidence of historical discrimination against the handicapped. *Taylor II,* 872 F.Supp. at 429. While I agree that some of these reasons are not convincing, we may not reverse simply because we do not like *some* of the reasons given by the district court. Rather, the circuit must examine the record in its entirety and determine whether the cumulative effect of all the evidence supports the finding of intentional discrimination. I believe that the record as a whole supports the district court's finding of intentional discrimination.

### A. Multiple–Family Characterization

First, the district court found that the city's determination that Mortenview was a multiple-family use and not a single-family use was evidence of discrimination. *Taylor II,* 872 F.Supp. at 429–33. I agree with the majority that this is not evidence of discrimination. The zoning ordinance clearly defines a family as a *non-profit* housekeeping unit. Taylor Zoning Ordinance § 2.02(36) (emphasis added). The district court conceded that Mortenview, as a for-profit concern, is not a family within the meaning of the statute. *Taylor II,* 872 F.Supp. at 431.

Instead, the district court found that Mortenview is not a permitted multiple-family use either. *Id.* Therefore, the district could conclude that the city arbitrarily designated Mortenview Manor as a multiple-family use. *Id.* This is simply not correct. First, it contradicts the circuit's previous opinion. The circuit expressly held that the zoning ordinance permitted AFC facilities as a special use in multiple-family districts. *Smith & Lee Assoc., Inc. v. City of Taylor, Mich.,* 13 F.3d 920, 926 (6th Cir.1993) (citing Taylor Zoning Ordinance § 7.03). Thus, that finding is the law of the case, and may not be overturned. *Miles v. Kohli & Kaliher Asso-*

*ciates, Ltd.,* 917 F.2d 235, 241 (6th Cir.1990). Moreover, that ruling is unquestionably correct; the zoning ordinance specifically provides that housing for the elderly is a permitted special use in multiple-family zones. Taylor Zoning Ordinance § 7.03(3). It is not discriminatory to conclude that Mortenview provides housing for the elderly; it is a statement of fact.

### B. Disparate Application of the Zoning Ordinances

Second, the district court found that the city's disparate application of its zoning ordinances was evidence of intentional discrimination. *Taylor II,* 872 F.Supp. at 433–35. It is well-settled that discriminatory enforcement of otherwise neutral zoning practices may be evidence of illegal discrimination. *Smith & Lee,* 13 F.3d at 927.

#### 1. Home Businesses

The first form of discriminatory enforcement identified by the district court is that the city treated home businesses in single family zones differently than it treated Mortenview. Again, I agree that this is not evidence of discrimination. The city's zoning ordinance specifically allows some home businesses in single-family zones if they are incidental to the property's primary use as a residence. Taylor Zoning Ordinances § 2.02(42). Mortenview does not fit within the city's definition of home business, however; its primary existence is as a business, and the business is not incidental to the property's use as a residence. Thus, Mortenview is not truly comparable to the home businesses in Taylor, and the city did not discriminate by treating it differently. *See Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992).

#### 2. Treatment of Non–Profit AFC Facilities

The second form of discriminatory enforcement identified by the district court is the city's disparate treatment of disabled and non-disabled groups of more than six residents who wish to live together in a non-profit setting. *Taylor II,* 872 F.Supp. at 434–35. Because the majority opinion does

not discuss this issue, some background is helpful.

Mortenview is located in a single-family zone. The city of Taylor defines a family as follows:

a. A family is defined as: an individual or group of two or more persons related by blood, marriage or adoption, together with foster children and servants of the principal occupants, with not more than one (1) additional unrelated person who are domiciled together as a single, domestic, housekeeping unit in a dwelling unit, or

b. A collective member [sic] of individuals domiciled together in one (1) dwelling unit whose relationship is of a continuing nontransient domestic character and who are cooking and living as a single *nonprofit* housekeeping unit.

Taylor Zoning Ordinance § 2.02(36) (emphasis added). Thus, while there is no limit on the number of people who can live together in a nonprofit setting, for-profit uses are prohibited entirely in the single family zone.

However, Michigan law provides that all AFC facilities with six or fewer residents are considered residential uses and permitted in all residential zones, notwithstanding any local ordinance to the contrary:

In order to implement the policy of this state that persons in need of community residential care shall not be excluded by zoning from the benefits of normal residential surroundings, a state licensed residential facility providing supervision or care, or both, to 6 or less persons shall be considered a residential use of property for the purposes of zoning and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone.

M.C.L. § 125.583b(2). Thus, the combined effect of the city ordinance and the state statute is to limit for-profit AFC facilities in single family zones to no more than six residents, but to place no limit on the number of residents in nonprofit AFC facilities in single family zones.

In accordance with this statutory scheme, the city argued at the first trial that it denied the petition to expand Mortenview beyond six residents because Smith & Lee was a for-profit entity. Joint Appendix at 901–02, 910–11. On the first appeal, we specifically noted that if Mortenview were a non-profit facility, the city would have allowed it to expand. *Smith & Lee*, 13 F.3d at 931.

However, at the second trial and on this appeal, the city maintained that it would not allow an AFC with more than six residents in a single-family district *even if it were nonprofit*, claiming that such a use would create density problems. *Taylor II*, 872 F.Supp. at 434 (emphasis added); Joint Appendix at 1600–01, 1616–17; Brief for Appellants at 12. This violates the city's own zoning ordinances, which do not put any limit on the number of people who may live together in a non-profit setting. *See* Taylor Zoning Ordinances § 2.02(36). In contrast, the city did not declare that it would not allow more than six non-disabled residents to live in a non-profit housekeeping unit in a single-family zone. *See Taylor II*, 872 F.Supp. at 434. In other words, the city explicitly stated that it would treat the disabled differently than those who were not disabled in violation of its own ordinances. This discriminatory enforcement is strong evidence of a discriminatory animus, and standing alone is sufficient to support the district court's finding of intentional discrimination. In addition, it entirely undercuts the non-discriminatory rationale for the city's decision, i.e., that the city was simply following its ordinances, which distinguish between profit and non-profit living arrangements.

Furthermore, the very fact that the city changed its rationale is evidence of discrimination. As we have specifically held in the employment discrimination context, a change in the reasons offered for a decision supports a finding that the reasons offered are pretexts for discrimination. *Schwartz v. Gregori*, 45 F.3d 1017, 1021 (6th Cir.1995). Here, the city's change in the rationale for its rejection of the petition to rezone is evidence of intentional discrimination.

Moreover, the density argument given by the city fails to withstand close inspection.

The city would not prevent any number of people from living together as a non-profit unit in a single-family area if they did not live in an AFC facility. Taylor Zoning Ordinances § 2.02(36). Yet a large number of people living together would have the same impact on density regardless of whether they lived in an AFC facility. The fact that the city is concerned only with the density of AFC facilities is further evidence of discrimination.

In summary, the city has admitted that it would violate its own ordinances to exclude an AFC facility. This is clear evidence of discrimination, and supports the district court's finding of intentional discrimination.

## C. Discriminatory Statements

Next, the district court relied on discriminatory statements made by city officials. *Taylor II*, 872 F.Supp. at 435. The majority concedes that city officials made a few discriminatory remarks, but considers them minor and not sufficient, standing alone, to warrant a finding of discrimination. This understates the number and import of the remarks.

First, Gerald Crouch, the city's executive director of developmental services, told the head of the Michigan Department of Social Services that he feared an AFC facility would house the mentally ill. Joint Appendix at 1180–81. He also testified on remand that it was his duty to protect Taylor's single-family property owners from AFC facilities in their neighborhoods. *Taylor II*, 872 F.Supp. at 435. This is clear evidence of a discriminatory attitude toward the disabled.

Moreover, one consultant to the city stated that he feared the disabled adults might endanger the safety of neighbors. Joint Appendix at 1631–33. The chairman of the city council said that he opposed Mortenview Manor because it would lower property values. *Taylor II*, 872 F.Supp. at 435. He also justified the decision based on fear for the safety of the residents in a fire. *Id.* Obviously, the fire safety issue is not relevant to whether the AFC facility is located in a single-family or a multiple-family neighborhood; the fire safety issue remains the same regardless of where the house is located.

The majority only addresses the remarks made by the chairman, which it would dismiss as the opinion of one member of the city council. However, those remarks evidence a paternalistic and discriminatory attitude toward the handicapped, at least on behalf of one member of the council. In addition, this reasoning ignores the other comments. Finally, the majority holds that these comments are not sufficient, standing alone, to warrant a finding of discrimination. However, these comments do not stand alone. When they are combined with the other evidence of discrimination, they support a finding that discrimination was a motivating factor in the decision not to rezone.

## D. Historical Discrimination

Finally, the district court relied on the city's history of discrimination against the disabled. *Taylor II*, 872 F.Supp. at 435–36. Historical discrimination is often excellent evidence of discriminatory intent. *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 563–64; *Smith & Lee*, 13 F.3d at 927–28. As the district court noted, Taylor has previously challenged the state's AFC licensing act in an attempt to keep an AFC facility out of Taylor. *See United States v. City of Taylor, Mich. (Taylor I )*, 798 F.Supp. 442, 448–49 (E.D.Mich.1992). This is strong historical evidence of discrimination against the disabled. On the first appeal, we specifically held that although this evidence is remote, it is also admissible and relevant. *Smith & Lee*, 13 F.3d at 928.

The majority relies on the remoteness of this evidence to discount its probative value. It is true that Taylor filed its challenge to the state law fifteen years ago. However, the events at issue in this case took place over 6 years ago. Thus, Taylor's challenge to Michigan's AFC licensing act occurred less than nine years before it denied the petition to rezone Mortenview. Moreover, even if the majority is correct, and this evidence, standing alone, is not sufficient to warrant a finding of discrimination, this evidence does not stand alone. It must be considered along with the discriminatory statements made by the city's officials and employees, and the

city's stated willingness to discriminate against the disabled in violation of its own ordinances.

### E. Alternative Rationales for the Decision

In summary, I believe that the evidence relied on by the district court is sufficient to support a finding that discrimination was a motivating factor in the decision not to rezone or otherwise accommodate Mortenview. Therefore, the burden shifts to the city to show that it would have reached the same decision absent any discriminatory motive.

The reasons provided by Taylor are entirely unconvincing. First, Taylor abandoned its argument that it was simply following the dictates of its ordinances, and admitted that it would have denied the petition even if Mortenview were non-profit and complied with the zoning ordinances. Second, Taylor relies on its concerns about density. However, as noted above, the city's density concerns are equally implicated by any large group of people living together. There is nothing especially dense about an AFC facility. Yet, Taylor would not have made the same decision if a group of non-disabled people had decided to live together. Thus, density would not have led the city to the same decision absent discrimination.

The majority argues that the city would have made the same decision due to its concerns about spot zoning. It is true that the city was reluctant to spot zone any property because it feared losing control over future uses of the property. *Taylor II*, 872 F.Supp. at 441. Thus, the district court concluded that rezoning was not a reasonable accommodation. *Id.* However, the city's concerns about spot zoning fail to explain the city's failure to accommodate Mortenview in other ways. As the majority recognizes, the city had many ways to accommodate Mortenview without spot zoning. For example, the city could have simply amended its zoning ordinance to create an exception for AFC facilities. In this way, the city could have accommodated Mortenview without losing control over the property.[2]

Because I believe that the evidence supports the district court's conclusion that a discriminatory animus was a motivating factor in the city's decision not to rezone or otherwise accommodate Mortenview, and that the evidence does not support the conclusion that the city would have reached the same conclusion absent that discriminatory animus, I would affirm the finding of the district court as to intentional discrimination.

### III.

Finally, because I disagree with the majority on the issue of intentional discrimination, I also disagree with the conclusion in part III–C–3 of the opinion that a civil penalty is inappropriate. The FHA provides that the district court may award a civil penalty of up to $50,000 for a first violation to vindicate the public interest. 42 U.S.C. § 3614(d)(1)(C)(i). We review the district court's decision to impose a penalty for abuse of discretion. *Smith & Lee,* 13 F.3d at 932. In determining whether to assess a penalty, the district court should consider "the nature and circumstances of the violation, the degree of culpability, any history of past violations, the financial circumstances of that Defendant and the goal of deterrence, and other matters that justice may require." *Id.* at 932 (quoting H.R. 711, 100th Cong., 2d Sess. 40, *reprinted in* 1988 U.S.C.C.A.N. 2201).

If I agreed that the city did not intentionally discriminate, then I might agree that a penalty is inappropriate. As we noted in our prior opinion, the law of reasonable accommodation is not sufficiently settled to justify a penalty simply for failure to accommodate. *Smith & Lee,* 13 F.3d at 932. However, because the district court found upon remand that the city intentionally discriminated, I believe that a penalty is in order.

On remand, the district court specifically did not impose a penalty for the city's failure to accommodate Mortenview Manor; rather

---

2. This is not to say that the district court should have ordered the city to amend its zoning ordinance. I agree with the majority that we lack the power to order the city to enact legislation. Rather, I am merely observing that a general refusal to spot zone does not, and cannot, explain the city's refusal to accommodate Mortenview, because the city had other ways of accommodating Mortenview without spot zoning.

it imposed a penalty for the city's intentional discrimination. *Taylor II,* 872 F.Supp. at 444. The district court then went on to detail the reasons for its findings. First, it pointed to the need to send a strong message to other communities that might seek to discriminate. *Id.* It also attacked what it called the city's discriminatory behavior and its "not in my backyard" attitude. *Id.* In light of these findings, which are supported by the evidence, I cannot find that the district court abused its discretion in awarding a penalty of $20,000.

### IV.

For the foregoing reasons, while concurring in parts I, II, III–B, III–C–1, and III–C–2 of the majority opinion, I respectfully dissent from parts III–A and III–C–3.