**Jessie and Albert HAMM, Plaintiffs–Appellants,**

v.

**CITY OF GAHANNA, OHIO, et al., Defendants–Appellees.**

No. 03–3120.

United States Court of Appeals, Sixth Circuit.

Aug. 31, 2004.

Alexander M. Spater, Spater Law Office, Columbus, OH, for Plaintiffs–Appellants.

Fred G. Pressley Jr., Marc L. Fleischauer, Porter, Wright, Morris & Arthur, Columbus, OH, for Defendant–Appellee.

Before: BOGGS, Chief Judge, and DAVID A. NELSON and SUTTON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

The plaintiffs in this case allege that the city of Gahanna, Ohio, its mayor, and certain members of its city council unlawfully refused to re-zone the plaintiffs' property so as to allow construction of group homes for elderly and disabled persons. The district court entered summary judgment for the defendants, holding that there was no more than a scintilla of evidence of unlawful discrimination and that the requested zoning change was not a necessary accommodation of persons with disabilities. Upon de novo review, we conclude that the challenged judgment should be affirmed.

I

The plaintiffs, Jessie and Albert Hamm, have lived on a five-acre lot in Gahanna since 1973. In 1994, the Hamms decided to build group structures for elderly and disabled persons on a portion of their property. They planned to build four homes, each of which would house five residents, and to operate the complex with the assistance of their children and a hired staff.

The property was zoned for single-family housing. Mr. and Mrs. Hamm sought a conditional use variance that would permit them to build group homes for the elderly and disabled, but the city's zoning administrator advised them that a variance could not be granted unless the code definitions of "family" and "family care home" were modified.[1] Mrs. Hamm worked with the zoning administrator and the city's planning commission to formulate modified definitions, but the Hamms eventually concluded that their conditional use application could be granted without modification of the code. They presented this possibility to the city attorney, who suggested that the better approach would be to apply for a zoning change. Mr. and Mrs. Hamm followed the attorney's advice and submitted their application for re-zoning in January of 1995.

The application was considered first by the planning commission, which held two public meetings on the matter. Several of the Hamms' neighbors voiced opposition to the proposed re-zoning. The concerns raised by the neighbors included: "increased traffic," "decline in property values," "safety issues," anticipated poor maintenance of the property by the Hamms, the questionable economic viability of the proposed facilities, and the possibility that the complex might become "a halfway house situation with drug addicts and alcoholics" or a "homeless shelter." Despite the opposition of the neighbors, the planning commission voted unanimously to recommend approval of the Hamms' application.

The application then went to the city council, which discussed the Hamms' proposal at four meetings in the spring of 1995. At the first meeting, the council heard from an attorney hired by neighbors who opposed the application. The attorney raised several issues, including the neighbors' concern that "[s]urrounding properties will be devalued and, if

---

1. During the relevant time period, Gahanna's planning and zoning code defined "family" as "one or more persons occupying the premises and living as a single housekeeping unit, as distinguished from a group occupying a ... family care home." "Family care home" was defined as "a facility which provides room and board, personal care and continuous twenty-four hour a day on-site adult supervision for three to twelve individuals ... who are mentally retarded, developmentally disabled, physically handicapped or aged (over sixty years of age) persons, who are able to be integrated into a family type setting and who do not require institutional care or treatment."

[the] project fails, further devaluation will occur." At the second meeting, members of the council discussed reservations relating to the Hamms' plan to build a private drive instead of a public street, limitation of the facility to elderly residents, and various legal questions raised by the lawyer for the opponents of the project. The council discussed some of these issues further in the third meeting. At the fourth meeting, the council heard again from the opponents' lawyer and from several of the neighbors themselves. The lawyer's remarks focused on "the impact on the economics of the neighborhood." The neighbors who were present echoed those remarks and argued against any commercial development of the property: "[w]e don't want a business over there"; "[l]eave it the way it is"; "your actions here tonight could dramatically hurt us in our pocketbooks and in our lifestyles."

When the matter came to a vote, the city council divided 3–3, with one abstention, thereby denying the application. Two of the council members who voted against the application said on the record that they did so to protect the neighbors' property values. The third member who voted "no" did not state his reasons.

In September of 1996, Mr. and Mrs. Hamm sued the city, the mayor, and the four city council members who had not voted in favor of the re-zoning application. The complaint alleged that in denying the application the defendants had violated the Fair Housing Act, 42 U.S.C. §§ 3604 & 3617, the Rehabilitation Act, 29 U.S.C. § 794, the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Ohio Fair Housing Act, O.R.C. § 411.02(H). (The complaint did not allege that the denial of the application violated any statute prohibiting discrimination on the basis of age.)

The Hamms sought compensatory and punitive damages as well as injunctive relief.

The defendants moved for summary judgment. The case was stayed, however, while the plaintiffs resubmitted their zoning change application to a new city council. The new council approved the application, thereby mooting the Hamms' request for injunctive relief.[2]

The district court then reopened the case and granted summary judgment in favor of the defendants on the Hamms' claims for damages. The court held (1) that Mr. and Mrs. Hamm had adduced no more than a scintilla of evidence of intentional discrimination of the sort prohibited by law and (2) that the Hamms could not show that the requested zoning change was a necessary accommodation of persons with disabilities. As a "partial alternative basis" for summary judgment, the court held that the Hamms' evidence of lost profits was too speculative. The court dismissed the state-law claim on immunity grounds, along with all claims against the individual defendants in their personal capacities, and it dismissed the request for punitive damages. Mr. and Mrs. Hamm filed a timely notice of appeal.

II

On appeal, the Hamms challenge the district court's rulings on intentional discrimination, failure to make accommodations, and lost profits. They do not challenge the dismissal of the state-law claim, the personal-capacity claims, or the punitive damage claims.

Federal law "prohibits excluding disabled persons from housing because of their disability and requires [the making of] reasonable accommodations necessary to ensure the handicapped equal housing

2. Counsel for the Hamms stated at oral argument that the proposed housing has never been built, despite the approval of the second re-zoning application.

opportunities." *Smith & Lee Associates, Inc. v. City of Taylor,* 13 F.3d 920, 924 (6ᵗʰ Cir.1993) (citing 42 U.S.C. § 3604). These provisions apply to "municipal zoning ordinances that affect housing opportunities for the disabled" and "discriminatory actions taken by municipalities pursuant to zoning ordinances." *Id.*

## A

■ To establish a prima facie case of intentional discrimination, the Hamms must present evidence to show that impermissible " 'discriminatory purpose was a motivating factor' " in the city council's decision to reject their application. *Smith & Lee Associates, Inc. v. City of Taylor,* 102 F.3d 781, 790 (6ᵗʰ Cir.1996) (quoting *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 270, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights,* 429 U.S. at 266.

Like the district court, we do not think the Hamms have presented the requisite evidence of invidiously discriminatory intent on the part of the defendants. The Hamms contend that the council rejected their application because of the opposition of the neighbors, and that the neighbors' opposition was based on the wrong sort of discriminatory animus. As we read the record, however, the reasons advanced for the neighbors' opposition were almost entirely free of any taint of bias against disabled persons, and we see no basis for concluding that the council's action was inspired by any remark that could fairly be said to reflect a suspect discriminatory animus.

The evidence identified by the Hamms consists of (1) statements of neighbors before the planning commission, (2) statements of one neighbor within the hearing of a city council member, and (3) statements of the neighbors and their attorney before the city council.

*Statements before the planning commission.* The members of city council did not attend the meetings at which the planning commission considered the Hamms' application, but the council was provided with copies of the minutes of those meetings. As reflected in the minutes of the first planning commission meeting, the chief concerns expressed by the neighbors related to traffic problems and property devaluation that the speakers believed would result from the construction of "apartments." In addition, the minutes record comments to the effect that "no age limit has been proposed as to who will live here; could be a halfway house situation with drug addicts and alcoholics; don't want people like these in my back yard." [3] The concern about "drug addicts and alcoholics" could not have motivated the council's rejection of the Hamms' application, the application having later been amended to preclude use for drug and alcohol rehabilitation.

At the second planning commission meeting, the speakers focused on the economic viability of the proposed complex, the potential consequences of its failure, traffic problems, and the effect of the facil-

---

**3.** The Hamms also cite one neighbor's comment that "[we are] not against single family residential but basically against apartments designed as single family residential homes for the elderly." Considered in its context—a discussion of the increase in traffic that might result from the addition of apartments to the neighborhood—this comment cannot reasonably be construed as an expression of bias against the elderly disabled. There is no suggestion that the speaker was more opposed to apartments for elderly disabled persons than to apartments for anyone else.

ities on property values. The one remark possibly indicative of the wrong kind of animus came during a comment on the consequences of failure: "what happens if this fails; an enclave of senior citizens is bad enough and how many of you voting tonight would want this next door to you; if this fails ... owners will be back here to ask for further variance to open up a halfway house or some sort of homeless shelter." This is the only remark in the record of the meeting that can arguably be construed as expressing bias against disabled persons, and such a construction depends on the assumption—which may or may not be correct—that "senior citizens" occupying a group home are likely to be disabled, or to be perceived as disabled.

*Statements within the hearing of a council member.* A city council member testified in her deposition that she overheard one of the opponents of the Hamms' application "trying to raise fear among his neighbors" by referring to "drug addicts" and "sex addicts," presumably as potential residents of the proposed facility. We do not think this testimony is probative of the council's motivation. The council member who overheard these remarks, Rebecca Miller, voted in favor of the application, not against it, and there is no evidence that any other council member overheard the remarks. (During the council's discussion of the application, however, Ms. Miller did make a very general reference to what she had heard.) In any event, the remarks in question do not seem to reflect a mindset related to the use to which the Hamms actually intended to put the property.

*Statements before the city council.* The comments of the neighbors and their attorney before the city council reflect concerns about property values, the character of the neighborhood, and legal impediments to the planned development. We see nothing in the meeting minutes or transcripts evincing bias against disabled persons, elderly or not. The Hamms cite the neighbors' "fear that 'those kinds of people' would move into the neighborhood and destroy it, concern that there would be a change of lifestyle, and comparing the group homes to a car wash." The reference to "those kinds of people" was made not by any of the neighbors, however, but by pro-Hamm council member Rebecca Miller as she paraphrased the remarks she had overheard concerning "drug addicts" and "sex addicts." The reference to a car wash was made by the Hamms' own attorney, who argued that the proposed development "is not a car wash." Finally, references to a change in lifestyle were not linked to the presence of disabled persons, but rather to the construction of commercial apartments as such. Considering the record in its entirety, we are not persuaded that a reasonable trier of fact could find that the neighbors harbored an antidisabled bias the articulation of which prompted the council to reject the Hamms' application.

The two council members who explained their "no" votes on the record cited the neighbors' concern about the effect of the proposed development on property values. The Hamms concede that such a concern "would not evince discriminatory intent" if it were genuinely held, but they argue that in this instance the concern was a pretext for impermissible discrimination. We see no basis on which pretext could be found.

The Hamms say there was evidence that the development would not harm neighbors' property values. But they have not pointed to any such evidence in the record. On the contrary, the record evidence—in the form of opinion letters from several realtors—suggests that property values could in fact be expected to decline as a result of the proposed development.

The Hamms argue that pretext can also be inferred from testimony that the city council does not ordinarily consider property values when deciding whether to approve a rezoning application. We do not think the evidence in question goes as far as the Hamms suggest. The three council members who voted "yes" on the Hamms' application testified that they themselves do not consider property values when voting on an application, but none of the three could say with certainty that no other council members ordinarily consider property values. Moreover, the testimony of one of the three council members appears to conflict with the transcript of the meeting at which the Hamms' application was voted upon. That transcript indicates that this member did in fact take into account the effect of the proposed development on neighboring property values. Finally, the city attorney had advised the council prior to its vote that it could consider the impact on surrounding properties. The evidence proffered by the Hamms is simply not sufficient to show that the expression of concern about property values was a pretext for illegal discrimination.

### B

■ To prevail on their theory that the defendants failed to make necessary accommodations, the Hamms must show that "but for the accommodation," the intended residents of the proposed facilities "likely will be denied an equal opportunity" to live in single-family neighborhoods. *Smith & Lee Associates,* 102 F.3d at 795.

The district court concluded that the Hamms could not make this showing "because they had the option of subdividing their property" and building as many as 15 homes, each of which could house up to three residents. The Hamms challenge this conclusion, arguing that Gahanna's planning and zoning code prohibited the operation of group homes in single-family neighborhoods regardless of the number of residents. They rely on the code definition of "family," which, as noted above, specifically excludes "a group occupying a ... family care home."

The defendants submitted uncontroverted evidence that, notwithstanding the city's definition of "family," at least nine group homes for elderly or disabled persons were operated in single-family neighborhoods in Gahanna during the early to mid-1990s. According to Gahanna's mayor (a defendant in this action), the city was not enforcing the prohibition against group homes in single-family zoning districts. Again, this evidence is not contested. The Hamms themselves stated during the proceedings before the city council that they were entitled to build 15 homes with three residents per home and would do so if the council denied their application for re-zoning.

The Hamms argue further that they would lose money if they operated 15 homes with three residents each rather than four homes with five residents each. But even if economic concerns prevented the Hamms from providing housing for disabled persons, it does not follow that such persons "likely [would] be denied an equal opportunity" to live in single-family neighborhoods. As we have seen, there were other group homes—not all of which were at full capacity—in Gahanna's single-family neighborhoods during the relevant time period. The Hamms presented evidence that there was a demand for additional housing for elderly disabled persons in Gahanna, but the same evidence also shows that the demand was being met by new development. Moreover, the Hamms' evidence does not demonstrate that there was a particularized demand for *single-family* housing for the elderly disabled, let alone that such a demand would go unmet absent the Hamms' proposed development. On this record, we believe, there is no way

a reasonable trier of fact could find that the accommodation requested here—rezoning of the Hamms' property—was necessary to ensure equal opportunity in housing.

Because we are satisfied that Mr. and Mrs. Hamm cannot prevail on their claims of intentional discrimination and failure to accommodate, we need not consider the district court's alternative holding that the Hamms' evidence of lost profits is too speculative. The judgment entered by the district court is **AFFIRMED**.