NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0164n.06

Case No. 17-1824

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Mar 30, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| GET BACK UP, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CITY OF DETROIT, MICH.; CITY OF | ) | MICHIGAN |
| DETROIT BOARD OF ZONING APPEALS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: KEITH, KETHLEDGE, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Dr. Billy Taylor has been trying to open a residential rehabilitation center for recovering drug addicts and alcoholics for over ten years. His facility, Get Back Up, is located on the outskirts of a residential neighborhood in Detroit, Michigan. But its doors are currently closed on account of a dispute with the City's zoning board.

Detroit, like many cities, regulates the number of non-traditional residences that can set up shop in or around neighborhoods that consist of mostly single-family homes. So things like fraternity houses, multi-family dwellings, and residential substance-abuse rehabilitation centers all need to get a conditional-use permit from the city before opening. *See* Detroit, Mich., Zoning Ordinance §§ 61-3-218, 61-9-80(6). Get Back Up applied for such a permit back in 2007, and

Detroit's urban-planning departments approved. But Get Back Up's residential neighbors appealed the departments' decision to Detroit's Board of Zoning Appeals, which then reversed.

Round one of litigation followed. Get Back Up sued the City and the Board, claiming that Detroit's zoning ordinance discriminated against recovering substance abusers. While litigation was pending, the parties reached an agreement that allowed Get Back Up to operate on a provisional basis. And for six years, Get Back Up did. But when Get Back Up lost the lawsuit, the City promptly shut the facility down. *See Get Back Up, Inc. v. City of Detroit*, 606 F. App'x 792 (6th Cir. 2015) (per curiam).

Undeterred, Get Back Up submitted a new permit application a few months later. And again, the City's planning departments approved, Get Back Up's neighbors appealed, and the Board reversed. That led to the second round of litigation. This time, instead of challenging the zoning ordinance's validity, Get Back Up claimed that the *Board's decision* discriminated against recovering substance abusers and asked the district court for a preliminary and permanent injunction. The district court denied both motions, finding, among other things, that Get Back Up had no chance of success on the merits. Get Back Up now appeals. We review the district court's denial of injunctive relief for abuse of discretion. *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012).

\*\*\*

Get Back Up claims the Board's decision violated three federal statutes: the Americans with Disabilities Act, the Fair Housing Act, and the Rehabilitation Act. As relevant here, each prohibits intentional discrimination against disabled persons, including recovering addicts. *MX Grp. v. City of Covington*, 293 F.3d 326, 332–40 (6th Cir. 2002).

Courts review intentional-discrimination claims under the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Anderson v. City of Blue Ash*, 798 F.3d 338, 356–57, 364 (6th Cir. 2015). Under this framework, Get Back Up bears the initial burden of making a prima facie case of discrimination. *Id.* at 357. To do so, the facility must present evidence showing that the City's decision-makers denied the permit because they harbored animus toward recovering addicts, or that they factored their constituents' animus toward recovering addicts into their decision. *Id.* (quoting *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006)). If Get Back Up makes its prima facie case, the burden then shifts to the Board to offer non-discriminatory reasons for its decision. *Id.* And if the Board does so, Get Back Up must show that a reasonable jury could find that those reasons were pretextual. *Id.*

Get Back Up carried its burden at step one. The Board twice reversed the Detroit planning departments' approval of Get Back Up's applications after Get Back Up's neighbors appealed. And at the public hearing following the neighbors' second appeal, some of those neighbors made comments that suggested animus toward recovering addicts. One woman noted that "Doctor Taylor didn't put [the clinic] where he lives." R. 4-6, Pg. ID 254. Another questioned who "would buy a house in the neighborhood where you're talking about hundreds and hundreds and hundreds and hundreds of drug addicts and possibly felons are two blocks from the school you plan on sending your kid." *Id.*, Pg. ID 255. And a Board member echoed these sentiments, commenting that "there's a difference in the perspective of people who live in the community with respect to 160 individuals who've got a history, have a problem and have to deal with that as to whether or not that's right for them in the R-1 district." *Id.*, Pg. ID 248. Together, these comments are sufficient to demonstrate a prima facie case of discrimination. *See*

*MX Grp.*, 293 F.3d at 341–42 (holding that methadone clinic demonstrated unlawful discriminatory animus in light of evidence that city relied on "unfounded fears and stereotypes" about recovering drug addicts in zoning decision).[1]

Get Back Up argues that the court's analysis should end here. The idea seems to be that discriminatory public opposition "taints" a zoning decision, and thus that the remainder of the *McDonnell Douglas* analysis need not apply. But none of the statutes at issue here make a city liable merely for being exposed to its citizens' allegedly discriminatory views—the City is only liable if its decision-makers *actually discriminated*. *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 794 (6th Cir. 1996) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 n.21 (1977)); *see also Budnick v. Town of Carefree*, 518 F.3d 1109, 1117–18 (9th Cir. 2008) (concluding that neighbors' allegedly discriminatory comments at hearing did not show discrimination because "hear[ing] the views of concerned citizens . . . is the essence of all zoning hearings"). So Detroit must be given an opportunity to show that its decision was not the result of animus. *See Smith*, 102 F.3d at 794.

The Board points to four non-discriminatory reasons for its decision: (1) complaints about trash and debris outside Get Back Up's facility, (2) Get Back Up residents' allegedly disruptive behavior during the years the facility was in operation, (3) concerns about neighborhood property values, and (4) concerns about the number of clients Get Back Up would be allowed to house if its permit was approved. And sure enough, at the hearing, Get Back Up's neighbors decried the facility's likely effect on property values—a mandatory consideration under Detroit's zoning ordinance. *See* Detroit, Mich., Zoning Ordinance § 61-3-231(3)

---

[1] This evidence is not sufficient to make a prima facie case under the Rehabilitation Act, which requires the plaintiff to show that the Board's decision was motivated "solely" by discriminatory animus toward Get Back Up residents. 29 U.S.C. § 794(a). For the reasons provided below, Get Back Up cannot do so.

(requiring the Board to consider whether the proposed use would "substantially diminish or impair property values within the neighborhood"); *Hamm v. City of Gahanna*, 109 F. App'x 744, 747–48 (6th Cir. 2004). They also worried about the number of residents Get Back Up would house—a concern that would have been implicated whether the proposed use was a rehabilitation center, a fraternity house, or a plain-old multi-family dwelling. *See* Detroit, Mich., Zoning Ordinance § 61-3-231(8) (requiring the Board to consider whether "[t]he Conditional Use will be compatible with land uses on adjacent and nearby zoning lots in terms of location, size, and character"). They complained about trash at Get Back Up's facility—which a Get Back Up employee admitted she had been a bit slow to address. *See* Detroit, Mich., Zoning Ordinance § 61-3-231(1) (requiring the Board to consider whether the "maintenance" of the proposed conditional use would be "detrimental to or endanger the social, physical, environmental or economic wellbeing of surrounding neighborhoods"). They alleged that Get Back Up's former clients had made "sexual innuendos" toward neighbors' children, had stolen things from the local pharmacy, and had trespassed on neighbors' property. And, perhaps most vigorously, they argued that Dr. Taylor had not been respectful of local residents and that Get Back Up's six-year track record suggested it would not be a good neighbor.

The Board members' comments during the hearing and its written decision suggest that these citizen concerns motivated the Board. Moreover, local grievances like these are the stock-in-trade of zoning boards everywhere, and they provide legitimate, non-discriminatory bases for the Board's decision. *See Hamm*, 109 F. App'x at 748 (city council's zoning decision not discriminatory where public hearing focused on "concerns about property values, the character of the neighborhood, and legal impediments to the planned development"); *see also Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 129 (1978) ("[T]his Court has recognized, in a

number of settings, that States and cities may enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city[.]").

Because the Board has met its burden, Get Back Up must demonstrate that the Board's reasons were pretextual. Get Back Up argues that the trash on the property was not Get Back Up's fault but was instead dumped there by others; that no one reported the purported incidents involving Get Back Up residents to Dr. Taylor; and that a property-values study the neighbors relied on was based on a substance-abuse facility in Virginia, not Detroit. That may all be true, but it misses the point. Even if Get Back Up did not dump the trash and Dr. Taylor did not know about the residents' alleged actions, it does not mean that the Board's reliance on the neighbors' allegations is suspect. And even if the Virginia property-values study was not locally sourced, Get Back Up has not shown that it lacked credibility or relevance. The neighbors claimed there was trash, bad behavior, and risk of a decline in property values—and they offered testimony and evidence to back it up. Get Back Up has not shown that these concerns were so implausible as to suggest that the Board acted from discriminatory motives. *Cf. Anderson*, 798 F.3d at 358–60 (summary judgment for city appropriate where it ordered removal of miniature horse from house because of "legitimate concerns of its citizens about the sanitation problems posed"); *Turner*, 195 F. App'x at 354–56 (summary judgment for city appropriate where it denied zoning request after reports that group-home residents had been "panhandling in the neighborhood and trespassing on other properties in the neighborhood"); *Hamm*, 109 F. App'x at 747–49 (summary judgment for city appropriate where it denied plaintiffs' re-zoning application due to neighbors' concerns about project's impact on the neighborhood and property values).

In the end, our job is not to weigh the credibility of the neighborhood witnesses, but simply to determine whether Get Back Up has made its case that the Board's proffered reasons

were pretextual.   Since Get Back Up has not presented sufficient evidence of pretext, we

**AFFIRM** the district court's decision not to issue an injunction.